**Fazley Bary MALIK et al., Plaintiffs,**

v.

**UNIVERSAL RESOURCES CORPORA-
TION et al., Defendants.**

**No. 73–78–GT.**

United States District Court,
S. D. California.

June 3, 1976.

David Herring, of Odorico, Franklin & Herring, San Diego, Cal., for plaintiffs.

Arthur Leinwohl, Los Altos, Cal., for defendant Block.

Howard B. Clayton, pro se.

## OPINION

BEEKS, Senior District Judge.

■ Plaintiffs bring this action charging defendants with sundry violations of federal securities law,[1] California State Corpora-

---

1. §§ 15 and 17(a) of the 1933 Securities Act, §§ 10(b) and 20(a) of the 1933 Securities Exchange Act [15 U.S.C. §§ 77o, 77q(a), 78j(b), 78t(a)].

tions Code[2] and Civil Code[3] provisions and California common law.[4] This Court's jurisdiction over the federal claims is conferred by § 22 of the 1933 Securities Act and § 27 of the 1934 Securities Exchange Act, and the state causes of action are cognizable under pendent jurisdiction.[5]

## FACTS

Plaintiffs Fazley Malik, Orest Chaykowsky, Morton Barish and Thomas Coor invested in common stock and 7% convertible debentures issued by the now defunct closely-held California corporation Universal Resources ("UR").[6] The investment transactions were spaced over a thirteen month period from December, 1968 through December, 1969. At all times material hereto Malik was an Indiana resident; Chaykowsky, Barish and Coor were New Jersey residents; and defendants Barry Block, Howard Clayton and Leonard Clark were California residents. Each plaintiff's investment dealings with UR, including the transmission of securities and money therefor, were conducted largely through the interstate mails and by means of interstate telephone communication. Defendant Block was a large UR shareholder and served as director and secretary-treasurer of UR throughout the period under consideration. Defendant Clayton served as attorney for UR and was a shareholder throughout the period under consideration. Defendant Clark became a shareholder in UR in November, 1968, the president of UR in August, 1969, and a UR director in October, 1969.[7] Clark succeeded one Paul Byers to the UR presidency. Byers was a founder of UR, its first president and its most dynamic promoter and policy maker throughout its corporate life. Because this case is complicated by multiple plaintiffs and defendants with the concomitant need to segregate evidence pertaining to each party, the salient facts and transactions affecting each plaintiff will be developed independently with the individual liabilities, if any, of the defendants analyzed thereafter.

## I. Plaintiff Chaykowsky

While the detailed facts respecting Chaykowsky's (and the other plaintiffs') dealings are obscured by lapse of time, there is sufficient available evidence to support the narrative findings that follow. On or about January 27, 1969, Chaykowsky purchased a UR investment package costing $10,200 which consisted of two $5,000 convertible debentures and 200 shares of UR common stock. This purchase was made after Chaykowsky had been in contact with Block and Byers for about three months discussing UR investment opportunities.

In October, 1968, while Chaykowsky was visiting Los Angeles on unrelated business, he had an informal meeting with Block whereat Chaykowsky first learned of UR and its investment potential. Block was Chaykowsky's former business associate and longtime professional colleague whose advice and business acumen Chaykowsky respected. Block described generally the anatomy and purpose of UR explaining that it was a private corporation established to

---

**2.** Cal.Corps.Code §§ 3018, 25110, 25401, and Cal.Corps.Code former § 25500.

**3.** Cal.Civil Code § 1709.

**4.** Commission of common law fraud is alleged.

**5.** Each of the alleged state violations arises out of the same transactions and operative facts as the federal claims. *See, e. g., Brunswick v. Regent,* 463 F.2d 1205 (5th Cir. 1972).

**6.** A default order was entered on September 10, 1973 against UR. UR filed for Chapter XI bankruptcy in or about January, 1972 and its securities are now worthless.

**7.** The parties stipulated at trial that Clark's directorship ran from October 1, 1969 to August 20, 1970. Plaintiffs' counsel represented at trial that Clark's tenure as president began on August 21, 1969 as borne out by UR minutes not introduced into evidence. This representation was not disputed and is consistent with the evidence before the Court. Accordingly, I so find. Clark's uncontradicted testimony was that he first purchased UR stock in November, 1968.

construct and operate hotels/motels—especially Holiday Inns of America, Inc. ("Holiday Inns") franchises—in California and abroad. Following this encounter, but still prior to his January, 1969 investment, Chaykowsky had many telephone contacts with Block as well as with UR's then president Byers concerning UR. The various witnesses understandably lacked distinct recollections of who initiated these calls, but it seems probable that calls were made in both directions, some originating in New Jersey and some in California. Representations made to Chaykowsky during this period included statements by Byers that UR was a "going concern" with "substantial assets" and "influential investors," that UR had an "inside track" with Holiday Inns for several franchises in different locales, that UR would soon obtain multi-million dollar financing through the International Development Bank, and that it was imperative that Chaykowsky decide quickly whether to invest because construction of a Holiday Inn complex was about to begin at Oceanside, California which would mark the participation deadline. Both Block and Byers represented to Chaykowsky that UR had theretofore secured a franchise from Holiday Inns for a motor inn at Oceanside; and, in response to inquiries by Chaykowsky, both informed him that UR was authorized to sell him securities notwithstanding his nonresident status. They both indicated that UR had previously sold securities to nonresidents and that there was no problem in that regard.

Chaykowsky also recalled a mid-January, 1969 telephone conversation with defendant Clayton in which Clayton allegedly confirmed the statements of Block and Byers to the effect that UR had authority to deal with Chaykowsky, adding that such authority had been granted by the California Commissioner of Corporations. Shortly thereafter, Clayton sent Chaykowsky a copy of UR's October 15, 1968 application [8] to the California Commissioner of Corporations for a permit to issue stock which,

according to Chaykowsky, Clayton provided for the purpose of documenting UR's authority to sell to him. A close perusal of that document reveals just the opposite: Chaykowsky was not one of the eligible purchasers listed on the application. Nevertheless, Chaykowsky testified that in his cursory inspection of this rather lengthy document he did not really understand its contents or realize that he was not a qualified purchaser as of said date. Although he is not to be commended for his acuity and diligence in reading the document, I accept as true Chaykowsky's testimony that he failed to discern from it his non-inclusion in the group that UR sought permission to deal with. It would have been the height of illogic for Chaykowsky to have knowingly purchased UR securities despite his ostensible ineligibility in view of his wariness and persistent efforts to verify UR's authority to deal with him earlier that same month. I find credible Chaykowsky's testimony that, to him, the document served merely to satisfy him that UR was a bona fide legal entity in California which was undertaking the formal steps necessary to issue stock.

On the other hand, I am not prepared to find that Clayton made the representation that Chaykowsky attributes to him in the aforementioned phone call. It is very possible that Chaykowsky is mistaken about the content of that conversation or the precise words spoken after the passage of more than seven years. No other plaintiff was able to directly or indirectly corroborate Chaykowsky's testimony in this particular, nor did any other plaintiff attribute such a representation to Clayton. Moreover, it would indeed have been a curious *non sequitur* for Clayton to have made the alleged statement and promptly put into Chaykowsky's hands a document that tended to directly refute it.

Chaykowsky ultimately received his stock and debentures from this first purchase sometime shortly after March 7, 1969. En-

---

**8.** Exhibit 42(E). No cover letter was produced to further illuminate Clayton's purpose in send-

ing this document to Chaykowsky. It may be that there never was such a letter.

closed with them was a cover letter [9] from Byers indicating that the permit to issue said securities had been received by UR on March 6, 1969.[10]

Chaykowsky made his second and last investment in UR on or about May 26, 1969, when he purchased an additional $1,000 worth of UR stock. Prior to this purchase numerous enthusiastic statements concerning UR's current prosperity and promising future were made to Chaykowsky by both Block and Byers in telephone conversations and at a series of east coast investment meetings attended by UR management personnel and various eastern investors. Specific illustrative recitations made to Chaykowsky during this period include: Block's February, 1969 statement that Oceanside construction was proceeding on a "crash basis"; Block's April, 1969 statements that construction at Oceanside was progressing and that UR was preparing to trade its securities publicly in the near future after a stock split was first effected; and Byers' May, 1969 statements that Oceanside construction was "on a crash basis" and that UR would soon undergo a 100 to 1 stock split after which it would be going public. In addition to the foregoing, Chaykowsky received shortly after April 14, 1969, along with his first (and only) debenture interest payments totalling $47.50, a letter [11] from Byers which stated that the Oceanside franchise had been "formally secured" and that construction at the Oceanside Holiday Inn would hopefully commence within 45 days. Finally, in April or May, 1969 Chaykowsky received a letter from Holiday Inns which referred to the granting of a franchise. This letter prompted Chaykowsky to call both Byers and Block to inquire about an apparent discrepancy between their earlier statements that UR had already secured a franchise and this more recent information. Block and Byers each responded that the reference in the Holiday Inns letter was only to an "update or re-issue" of the franchise to reflect the addition of new UR shareholders. Block added that Holiday Inns required this information in order to investigate the new shareholders for possible "Mafia connections."

Chaykowsky surrendered his two debentures at the behest of Block and Byers on or about December 11, 1969 exchanging them for shares of UR common stock at a conversion ratio of one share per each $10 of cancelled indebtedness. In considering the stimuli leading to this final transaction involving Chaykowsky, mention must first be made of the so-called Prospect merger. UR and Prospect Development Company, another California corporation, entered into a merger agreement [12] on or about June 24, 1969 by the terms of which the two corporations would, upon the satisfaction of certain conditions precedent, merge into a single corporation with UR being the survivor. This agreement, of course, required the approval of the UR shareholders, and Chaykowsky received a proxy form and related documents including so-called "Contribution" [13] and "Guaranty" [14] agreements in July, 1969. I am able to make no specific

---

9. Exhibit 64(D).

10. Exhibit 42(D).

11. Exhibit 29. *It appears that the original cost of most of the UR stock held by the plaintiffs was $1 per share. After a stock split, occurring in the latter part of 1969, each of the original shares was split into 100 new shares so that each of the post-split shares represented an original investment of $.01 each. The debentures were later converted by each of the plaintiffs into the post-split shares.*

12. Exhibit A.

13. Exhibit 7(G). This agreement constituted a personal guaranty by each UR signatory to the extent of his pro rata stock ownership in UR of the $500,000 which, under the terms of the merger agreement, UR agreed to pay the former shareholders of Prospect upon tender of their UR stock and warrants in the event that UR did not or could not achieve public status via registration with the S.E.C. on or before August 31, 1970. *See* Exhibit A.

14. Exhibit 7(G). This Guaranty agreement contained the same basic provisions as the Contribution agreement described in note 13, *supra,* but required the signatories to personally guarantee the *entire* $500,000 rather than only their pro rata share.

findings as to representations made to Chaykowsky concerning this merger, but suffice it to say that both Block and Byers touted the proposed venture as an unqualified boon which would provide UR with valuable new property and enhanced cash flow. Chaykowsky never saw a copy of the merger agreement itself, but may have become acquainted with its terms in telephone conversations with Byers or Block during June and July of 1969. Be that as it may, he ultimately executed the proxy and Contribution agreement, refusing to sign the Guaranty, on or about August 8, 1969.[15] Not long afterwards the merger did in fact take place.

In September or October of 1969 Chaykowsky was approached by Block concerning the surrender and conversion of his debentures. In a phone conversation, Block told Chaykowsky that the surrender was required by the California Commissioner of Corporations before UR could trade publicly. Byers, too, represented to Chaykowsky in a later telephone call that Chaykowsky would be foreclosed under California law from participating in future public sales or the upcoming stock split unless he surrendered his debentures.[16] Near the end of October, Byers again encouraged Chaykowsky to surrender the debentures reiterating that Chaykowsky could not take part in the stock split until he converted them.[17] Chaykowsky next contacted Clayton and asked him whether there was any legal compulsion of the sort described by Block and Byers to convert the debentures. Clayton did not directly respond in the call but did answer the question in a letter[18] dated December 4, 1969 informing Chaykowsky that, despite some apparent confusion, there existed no legal requirement to surrender. Clayton did, though, in the same letter call Chaykowsky's attention to the

practical benefits that would accrue to UR upon the elimination of these corporate debts.[19] In somewhat anticlimactic fashion, Chaykowsky soon thereafter consented to the conversion.

Some of the preceding which details Chaykowsky's experiences with UR and its representatives is not crucial for the resolution of issues presented herein but is included only to capture the flavor of the UR operation as perceived by an outside shareholder. Chaykowsky alleges violations of law and seeks relief with respect to each of his two securities purchases and his later debenture conversions.

## II. Plaintiff Malik

Malik purchased his first UR investment package consisting of two $5,000 convertible debentures and 200 shares of common stock on or about December 6, 1968. The cost was $10,200. Prior to this investment Malik became acquainted with UR when Block, whom Malik had known professionally for nearly eight years, gave him a general description of its nature and purpose together with the customary glowing appraisal of its future while the two were attending a physics conference at Miami, Florida in November, 1968. Both Block and one Gerald Chaplin, who was then a director and vice-president of UR, urged Malik to act quickly if he desired to invest in UR emphasizing that time was of the essence. Although Block spoke to Malik about the plans for a Holiday Inn at Oceanside, Malik could not state with certainty that any firm representation was made to him that UR had secured a franchise for that site.

Malik purchased another UR debenture/stock package in February, 1969, this time paying $5,100 for one $5,000 con-

---

**15.** *See* Exhibit 27.

**16.** Exhibit 64(C), though written long after the fact, tends to corroborate this portion of Chaykowsky's testimony with respect to both Byers and Block.

**17.** *See* note 11, *supra.*

**18.** Exhibit 24. Of all the plaintiffs, only Chaykowsky received such an explanatory letter.

**19.** *Id.*

vertible debenture and 100 shares of common stock. This purchase followed closely a January, 1969 telephone call from Chaplin in which Chaplin revealed that another debenture/stock parcel had become available and that Malik could purchase it if he acted quickly. Malik then sought advice from Block as to the wisdom of this second proposed investment and received assurance that it was a very good investment. Malik undertook the purchase and received his stock and debentures from both of his purchases on or after March 7, 1969.

In June, 1969 Block informed Malik about the proposed Prospect merger plan. Block stated that the merger would enhance UR's chances of going public and would provide a new source of income for UR. Malik complained to Block at this time that he had received only one interest payment from UR on his debentures, that being in the amount of $71.25 received shortly after April 14, 1969 [20] and that subsequent payments were overdue. Block assured him that the payments would be resumed after the Prospect merger was consummated. The payments were not, in fact, ever resumed. Later in June of 1969, Malik executed the previously described merger documents, including both the Contribution and the Guaranty agreements,[21] having never been shown a copy of the merger agreement or made properly aware of its terms—some of which were onerous in their application to UR shareholders.[22] Said documents were signed by Malik at Clayton's office in La Jolla, California in the presence of Block.

In October, 1969 Block contacted Malik and requested that he convert his $15,000 worth of debentures into UR common stock stating that such action was "necessary" in order for UR to go public. Sometime after that conversation, Byers called Malik and told him that, unless he surrendered his

debentures, Malik could not be included in the public registration ("S–1 registration"). Malik then received a letter [23] from Clayton dated October 22, 1969 which invited Malik to cooperate with UR in several specified ways including the surrendering of his debentures. Malik finally acceded to the insistent petitions of Block, Byers and Clayton and surrendered his debentures on or about December 2, 1969. At the same time, though, he protested vigorously that the conversion ratio was unfavorable.[24] Malik made his last purchase of UR securities in December, 1969 buying $1,000 worth of UR common stock.

Malik contends that he is entitled to relief with respect to each of his three securities purchases and his debenture conversions in view of alleged violations of law attending each transaction.

### III. Plaintiff Barish

The evidence bearing on Barish's various investment transactions with UR is much less voluminous than was the like evidence relating to Chaykowsky and Malik. Barish had no meetings, telephone conversations or correspondences with Block—no direct dealings of any sort—during Barish's association with UR. The vast majority of his information concerning UR came from Byers or through Chaykowsky, who was Barish's business associate.

Barish first became aware of UR in an October, 1968 conversation with Chaykowsky. Barish then contacted Byers to gain additional information about UR investment opportunities. Barish had at least two such discussions with Byers prior to his initial investment. Barish recalled few particulars about these conversations with Byers but did recall Byers' statement that construction was to begin soon at Oceanside and that there was a "relatively immediate"

---

20. *See* Exhibit 34.

21. Exhibits 7(G), (I).

22. *See* note 9, *supra,* which explains one such provision.

23. Exhibit 7(B).

24. *See* Exhibit 7(L). The same conversion ratio applied to all plaintiffs herein in their respective debenture conversions. *See also* note 11, *supra.*

need for Barish's money should he elect to invest. Barish purchased a $10,200 UR package (two $5,000 convertible debentures and 200 shares of common) in January, 1969.[25] Barish received his stock and debentures sometime after March 7, 1969 [26] and his sole debenture interest payment of $47.50 in April, 1969. Barish purchased an additional $1,000 worth of UR common stock on or about May 26, 1969.[27]

Barish, like Malik and Chaykowsky, ultimately surrendered his debentures to UR for additional shares of UR common. This occurred at some indeterminate date toward the end of 1969, probably in December. Byers had approached Barish about the surrender in October or November of 1969 by both telephone and letter. Byers stated in some or all of those communications that the debenture surrender would improve UR's prospects of going public, that this debenture conversion was a requirement of California law, and that Barish's position in a future public offering would be jeopardized if he held on to the debentures. Clayton, too, got involved by asking Barish to surrender his debentures in an October 21, 1969 letter.[28]

Barish asserts that he is entitled to relief with respect to his two purchases of UR securities and his subsequent debenture surrender.

### IV. Plaintiff Coor

Coor did not appear at trial nor was any competent evidence offered in support of his claims against these defendants. Each of his causes of action are consequently dismissed.

### V. Facts Re Universal Resources

UR was an outgrowth of an earlier corporate venture involving, from what I can gather, the same management team. This first venture similarly contemplated the construction and operation of hotels and motels—primarily in Mexico—and was conducted under the name Rancho Mexico. Rancho Mexico was a closely-held California corporation created on or about May 23, 1968.[29] It applied for, and on August 5, 1968 [30] the California Commission of Corporations granted, a permit to negotiate for the sale of stock and $1,000 debentures. Under this permit the only one of the plaintiffs with whom Rancho Mexico could negotiate was Malik. The permit expressly forbade the issuance or sale of securities absent further application to and permission from the Commissioner.

Although it is impossible from the available evidence to determine with exactitude when (or why) UR was created to succeed Rancho Mexico, a permit to issue and sell stock and $5,000 convertible debentures was applied for by UR on or about October 15, 1968.[31] The application was granted and a permit issued on October 21, 1968.[32] This application did not name, nor did the permit authorize sales to, any of the plaintiffs herein. It was not until March 3, 1969 that an application [33] was filed with the California Commissioner seeking authorization to sell the described securities to plaintiffs Chaykowsky, Malik and Coor. Barish's name, for reasons not made clear, was omitted from the investor list in the application. The monies received from Chaykowsky, Malik and Coor prior to the date of said application were disclosed in the application but

---

25. The evidence here, as with many other significant events discussed herein, regrettably does not pinpoint the exact date of the transaction.

26. See Exhibit 64(M).

27. Although Exhibit 64(I) gives the impression that the investment amount was $2,000, it is stipulated in the Pretrial Order (p. 6) that only $1,000 was invested on this occasion.

28. Exhibit 64(F).

29. See Exhibit 42(C).

30. Exhibit 5(A).

31. Exhibit 42(E).

32. Exhibit 5(B).

33. Exhibit 42(A). The filing date is disclosed in Exhibit 42(D).

characterized as "advances" (loans constituting corporate debts) to UR made by said individuals. UR proposed in the application to issue specified quantities of stock and debentures (identical to the quantities actually purchased) to these "lenders" in consideration of their cancellation of the "debts". This application was signed by Byers. An appropriate permit [34] was issued by the California Commissioner on March 5, 1969. UR, in obtaining this permit, did not follow the procedures set forth in the California Corporations Code [35] to make the permit retroactively effective. Moreover, it is far from clear that UR could have qualified for such treatment had it done so.[36]

Mindful of the representations made to Chaykowsky respecting a franchise at Oceanside, it becomes necessary to carefully examine the history of UR's business dealings with Holiday Inns. UR was in contact with Holiday Inns during the fall of 1968 endeavoring to secure a license for the establishment and operation of an Oceanside motor inn. Byers represented UR in negotiations with Holiday Inns executives at their Memphis, Tennessee offices on several occasions. Block accompanied Byers on one such visit during the fall of 1968 and joined in the discussions concerning the franchise.

It was not until March 24, 1969 [37] that Holiday Inns formally approved UR's license application and issued to UR its standard "letter of commitment." [38] The letter was in the form of a unilateral contract which set forth terms and conditions that UR had yet to fulfill before a license agreement would be issued. Under the terms of the letter UR had to demonstrate compliance with Holiday Inns standards and specifications respecting the following in order to qualify for a license: financing, construction timetables, detailed project plans, general contractor, furnishings and fixtures, training of innkeepers, and ar-rangements for nearby service station facilities. UR was also required by the terms of the letter to maintain its current community of shareholders intact, accepting no new shareholders prior to receipt of the license. Noncompliance with any of the provisions of this letter would terminate the agreement and result in the forfeiture of the franchise fee ($10,000).

Clayton testified without contradiction that the Holiday Inns letters of commitment were commonly and properly referred to as "franchises" in the hotel industry and related investment circles. In the absence of evidence to the contrary, I accept this testimony and so find. However, Block's representations to Chaykowsky prior to Chaykowsky's January, 1969 investment to the effect that UR already possessed a franchise to construct a Holiday Inn at Oceanside were, at best, premature. At the time of these representations UR had only tentative verbal approval of its chosen construction site and its initial investors, officers and directors. Indeed it appears, although I make no finding in this regard, that during the fall of 1968 the acquisition of the necessary Oceanside real estate was not even completed and municipal approval for the required zoning change had not yet been granted.

There is no evidence from which the progress, if any, of construction at Oceanside at times pertinent to this lawsuit can be determined. What is known is that on or about August 3, 1971 the commitment letter expired [39] after UR had been granted one or two construction deadline extensions.[40] Neither is there any evidence upon which to base a realistic finding as to the value of the debentures at the time of plaintiffs' surrender. By that time they were almost certainly worth much less than their face value.[41] Lastly, plaintiffs offered

**34.** Exhibit 42(D).

**35.** Cal.Corps.Code §§ 25800 et seq.

**36.** See Cal.Corps.Code § 25802.

**37.** See Exhibit 73.

**38.** Exhibit 37(E).

**39.** See Exhibit 43.

**40.** See Exhibits 37(B), (F).

**41.** See Exhibits 48, 49, 50 in this regard.

no evidence concerning the impact, qualitatively or quantitatively, of the Prospect merger on their UR holdings.

The UR enterprise had its genesis in the high hopes and substantial energies of its founders—notably, Byers, Chaplin and Block. There is no question about its being a bona fide, good faith business venture at the outset, and each of the defendants (as well as Byers and Chaplin) devoted considerable time and labor to UR during their periods of association with it. Nevertheless, the uncontrolled enthusiasm of at least some of the UR management personnel resulted in frequently irresponsible and cavalier treatment of its eastern investors. Permits to issue stock were not timely acquired, misinformation was dispensed to shareholders, inquiries from shareholders regarding UR's financial health were disregarded,[42] and hasty investment decisions were frequently forced upon the poorly informed eastern investors. Such behavior on the part of corporate executives and promoters is not only reprehensible and deserving of censure; it also exposes the principal actors to liability under state and federal law.

### THE APPLICABLE LAW

The original complaint filed herein set forth seven causes of action alleging violations of the following provisions of state and federal law which are set forth seriatim:

(1) §§ 5 and 12(1) of the Securities Act of 1933 [15 U.S.C. §§ 77e, *l*(1)];

(2) § 12(2) of the 1933 Act [15 U.S.C. § 77 *l*(2)];

(3) § 17(a) of the 1933 Act [15 U.S.C. § 77q(a)];

(4) § 10(b) of the Securities Exchange Act of 1934 and Rule 10B–5 promulgated thereunder. [15 U.S.C. § 78j and 17 C.F.R. § 240.10b–5];

(5) California Corporations Code §§ 3018, 25110, 25401 and former California Corporations Code § 25500 (repealed on January 2, 1969); [43]

(6) State common law fraud; and

(7) California Civil Code § 1709 ("negligent misrepresentation").

Plaintiffs subsequently abandoned[44] the first and second causes of action and during trial the Court dismissed the sixth cause of action as to all defendants. The Court further held that plaintiffs had failed to prove a conspiracy on the part of any of the defendants to accomplish the alleged violations of law.

### I. State Claims

California Corporations Code § 25110 (effective on and after January 2, 1969) declares it unlawful for any person "to offer or sell in this state any security in an issuer transaction . . . unless such sale has been qualified under [other recited code sections] . . . ." Former California Corporations Code § 25500 (in force prior to January 2, 1969) stated:

No company shall sell any security of its own issue, except upon a sale for a delinquent assessment against the security made in accordance with the laws of this State, or offer for sale, negotiate for the sale of, or take subscriptions for any such security, until it has first applied for and secured from the commissioner a permit authorizing it so to do.

The stock and debentures sold to Malik in December, 1968 and February, 1969, and to Chaykowsky, Barish and Coor in January, 1969 were not qualified by permit or otherwise within the meaning of the above sections, nor have defendants seriously argued that they were. Consequently, each of the specified transactions violated one or the other code provision. Violations of § 25110 give rise to rescissory or compensatory relief fixing liability personally on the sell-

---

**42.** Both Chaykowsky and Malik made repeated requests for financial reports to Block and Byers without success, though the exact times of the requests cannot be fixed.

**43.** *See also* Cal.Corps.Code § 25704.

**44.** Pretrial Order at 1.

er(s) of the securities.[45] Sales of securities prior to January 2, 1969 sans permit or in violation of the terms of a permit are deemed void by law,[46] and the seller must refund all monies received in connection with the void sale.[47] Notwithstanding defendants' manifest violations of § 25110, plaintiffs are foreclosed from recovery in connection with the 1969 transactions indicated above by the two year absolute statute of limitations embodied in California Corporations Code § 25507.[48]

On the other hand, and somewhat ironically, Malik's first and older claim based upon his $10,200 purchase in December 1968, is not time barred. The statute of limitations applicable to former § 25500 was (and is) California Civil Procedure Code § 338(4)[49] which bars actions not brought within three years after "discovery, by the aggrieved party, of the facts constituting the fraud or mistake." The defendants stipulated at trial that plaintiffs could not have discovered such facts, assuming that they existed, prior to filing their complaints in this cause. Therefore, defendants have waived any defense based upon the running of a limitation period keyed to the discovery of wrongdoing or facts indicative thereof. This being the case, Malik is entitled to recover his $10,200 from Block who solicited and sold the unauthorized securities to him.

California Corporations Code § 25401 tracks corresponding provisions of the Federal Securities Act of 1933 and the Securities Exchange Act of 1934.[50] It provides:

> It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

Claims under § 25401 are subject to an absolute four year statute of limitations as set out in California Corporations Code § 25506. Accordingly, the only transactions with respect to which § 25401 claims can yet be maintained[51] are the December, 1969 debenture surrenders by Malik, Chaykowsky and Barish and the $1,000 stock purchase by Malik also occurring that month. I find no material misrepresentations or omissions tainting Malik's stock purchase, and the complete absence of competent evidence demonstrating actual damage to plaintiffs from the debenture conversions prevents recovery with respect thereto. Furthermore, absent evidence of damage or value, rescission would obviously be an inappropriate and unworkable remedy.

Plaintiffs allege violations by each defendant of California Civil Code § 1709 which states: "one who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."

---

**45.** Cal.Corps.Code § 25503.

**46.** Former Cal.Corps.Code § 26100.

**47.** See Gormely v. Dickinson, 178 Cal.App.2d 92, 102–03, 2 Cal.Rptr. 650 (1960).

**48.** Malik filed his original complaint in this action on March 5, 1973. The remaining plaintiffs joined on July 11, 1973. The latest event that serves to start the applicable statute of limitations running on these securities transactions was the receipt and acceptance by UR of plaintiffs' checks which was the same event used herein to date the individual transactions.

**49.** There was no limitation provision in California law made expressly applicable to former § 25500, but Clayton suggests in his trial brief (p. 8), and the other parties have not dissented, that Cal.Civil Procedure Code § 338 applied to violations of § 25500 where, as here, seller had no reasonable grounds to believe that a permit was not required. Furthermore, this conclusion is bolstered by remarks in Gormely v. Dickinson, 178 Cal.App.2d 92, 104, 2 Cal.Rptr. 650 (1960). The Gormely court likened civil actions brought under § 25500 to actions for fraud or negligent misrepresentation and, thus, concluded that they were analogously covered by the § 338 limitation provisions. I so hold.

**50.** § 17(a) of the 1933 Act and § 10(b) of the 1934 Act.

**51.** See note 48, supra.

Section 1709 is further explicated in § 1710 which states:

A deceit, within the meaning of the last section, is either:

1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

3. The suppression of a fact, by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or,

4. A promise, made without any intention of performing.

The provision of § 1710 that establishes a cause of action for negligent misrepresentation under § 1709 is § 1710(2).[52] The relevant statute of limitations is again found in Civil Procedure Code § 338 which, as previously explained, presents no bar herein. I

find that Block's representations to Chaykowsky that UR had secured a Holiday Inns franchise prior to Chaykowsky's January, 1969 investment transgressed § 1709. Chaykowsky is entitled to recover his $10,200 from Block which was invested, I find, in reliance on this supposed fact.[53] I find no other violations of this section inherent in the subject sales transactions, and, as previously indicated, recovery is not allowable in respect to the debenture surrender without proof of value.

The final section of the California Corporations Code that plaintiffs cite is § 3018 which creates liability for the knowing dissemination by corporate personnel of *written* falsehoods. I find no violation of § 3018 committed herein.

## II. Federal Claims

Defendants are also charged with making material misrepresentations and omissions violative of § 17(a) of the 1933 Securities Act and Rule 10B–5 promulgated under § 10(b) of the 1934 Act.[54] The interpreta-

---

**52.** *See, e. g. Gagne v. Bertran,* 43 Cal.2d 481, 275 P.2d 15 (1954); *Yellow Creek Logging Corp. v. Dare,* 216 Cal.App.2d 50, 57, 30 Cal. Rptr. 629 (1963).

**53.** California law limits damages under § 1709 to compensation for "all the detriment proximately caused . . .." Cal.Civil Code § 3333; *Gagne v. Bertran,* 43 Cal.2d 481, 492, 275 P.2d 15 (1954). I find that Chaykowsky would not have made the indicated investment had he known the truth about the Oceanside "franchise", and, therefore, the misrepresentation proximately caused him to part with $10,200 to his detriment.

**54.** § 17(a) [15 U.S.C. § 77q(a)] provides:
Fraudulent interstate transactions
   (a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—
   (1) to employ any device, scheme, or artifice to defraud, or
   (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
   (3) to engage in any transaction, practice, or course of business which operates or

would operate as a fraud or deceit upon the purchaser.
§ 10(b) [15 U.S.C. § 78j(b)] provides:
Manipulative and deceptive devices
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
   (a) . . .
   (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
Rule 10B–5 provides:
Employment of manipulative and deceptive devices.
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or by the mails or of any facility of any national securities exchange,
   (a) To employ any device, scheme, or artifice to defraud,
   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances

tion and application of the Securities Acts of 1933 and 1934 is greatly simplified by the very recent United States Supreme Court decision in *Ernst & Ernst v. Hochfelder.*[55] The *Ernst* Court examined the language, purpose and legislative history of § 10(b) of the 1934 Act, analyzed its role in the broad legislative scheme embodied in the 1933 and 1934 Acts and concluded that there could be no civil liability imposed under that statute (or under Rule 10B–5) unless the allegedly wrongful activities involved "scienter." [56] In other words, proof of merely negligent material misrepresentations or omissions will not suffice to establish civil liability.

The *Ernst* case, though, did not involve a claim brought under § 17(a) of the 1933 Act and, therefore, the Court did not pass upon the necessary elements of proof thereunder. While granting that the precise language of § 17(a)(2) does not so clearly as § 10(b) bespeak a Congressional intent to reach only purposeful wrongdoing, I nonetheless hold that, at least with respect to civil claims, scienter is also an essential element of proof under § 17(a). This determination is based upon two primary considerations. First, both statutory provisions admit civil actions only impliedly with the courts having recognized civil remedies as a salutary means of providing relief to victims of the fraudulent and unfair securities practices outlawed thereunder. Furthermore, courts and scholarly commentators alike have generally treated these provisions interchangeably as affording the same remedies and requiring identical proof to establish liability.[57] To now hold that scienter is a required element of proof under § 10(b) of the 1934 Act but not under § 17(a) of the 1933 Act would create an undesirable and, I believe, unintended asymmetry of coverage between the two Acts which would certainly result in all such future civil claims being brought under § 17(a) to avoid the stiffer proof requirement of § 10(b). Such a ruling would signal the easy circumvention and swift desuetude of *Ernst.*

Second, it is significant that each of the civil remedies under the 1933 Act that expressly permit recovery for merely negligent conduct is coupled with procedural restrictions not applicable to § 17(a) of that Act.[58] In that regard, the following conclusion reached by the *Ernst* Court with reference to § 10(b) of the 1934 Act is equally applicable to § 17(a) of the 1933 Act: [59]

We think these procedural limitations indicate that the judicially created private damage remedy under § 10(b)—which has no comparable restrictions—cannot be extended, consistently with the intent of Congress, to actions premised on negligent wrongdoing. Such extension would allow causes of action covered by § 11, § 12(2), and § 15 to be brought instead under § 10(b) and thereby nullify the effectiveness of the carefully drawn procedural restrictions on these express actions. [citations omitted] We would be unwilling to bring about this result absent substantial support in the legislative

under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**55.** 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

**56.** The Court defined scienter to mean a "mental state embracing intent to deceive, manipulate, or defraud." It was not decided whether recklessness alone would satisfy the scienter requirement. 425 U.S. 185, 194, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668, note 12 (1976).

**57.** *See, e. g., White v. Abrams,* 495 F.2d 724, 727 note 2 (9th Cir. 1974); *Flaks v. Koegal,* 504 F.2d 702, 707 (2d Cir. 1974); *Pfeffer v. Cressaty,* 223 F.Supp. 756 (S.D.N.Y.1963); 2 BROMBERG, SECURITIES LAW: FRAUD § 8.4(330) at 204.33 (1975).

**58.** *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) which makes the identical observation in discussing § 10(b) of the 1934 Act.

**59.** 425 U.S. 185, 210, 96 S.Ct. 1375, 1389, 47 L.Ed.2d 668 (1976).

history, and there is none. [footnotes omitted]

Having concluded that the imposition of civil liability under both § 17(a) and § 10(b) requires a showing of scienter, I turn to the allegations and proof herein.

■■■■■ Block's representations to the effect that UR had received a franchise, when the truth was that a letter of commitment had not been obtained, was more than a merely careless misstatement. It was a knowing untruth calculated to induce earlier and larger investments in UR than might otherwise have been hoped for. Chaykowsky justifiably believed this material representation and, relying thereupon, purchased $10,200 worth of UR securities in January, 1969. He is entitled to rescission and the restoration to him by Block of that sum under both § 17(a) and Rule 10B–5.[60] This constitutes an alternative ground for the recovery to which Chaykowsky has already been held entitled under California law.

■■■■■ I hold that each plaintiff, except Coor, is entitled to rescission and reimbursement by Block of all monies invested in UR at times prior to March 5, 1969, the date on which UR first received authorization from the California Commissioner of Corporations to issue and sell securities to them. This holding is based upon Block's status as a "control person" in UR with respect to Byers' conduct, Block's express representation that UR had authority to sell to Chaykowsky, and what I find to be Block's intentional failure to disclose to Malik and Chaykowsky the following material facts: UR was not authorized to sell securities to them, the sales violated California law and the sales, under these circumstances, were void by state law. Byers is similarly chargeable with the identical intentional nondisclosure to Barish in their dealings. Block's liability to Barish arises from the fact that Block was a party who could exercise control over Byers within the meaning of § 20(a) of the 1934 Act.[61] While § 20(a) creates a liability, it also creates an avenue of escape. Liability is avoided upon proof that the charged party "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." Block failed to make the required showing. The above holding represents an alternative ground for Malik and Chaykowsky to recover their $10,200 investments made respectively in December, 1968 and January, 1969.

■■■ Scienter with respect to said nondisclosures is established by ample circumstantial evidence. Block's admitted regular attendance at and participation in UR board meetings throughout the period under consideration might well suffice in itself to charge him with such knowledge. More persuasive, though, is the evidence revealing that UR treated each of these unauthorized investments as "advances" (loans) rather than purchases prior to receipt of the necessary permit and that Block was aware of such treatment. Block testified that he read and submitted to the UR board of directors each of the unaudited UR financial statements prepared by an accounting firm. The financial statement of January 31, 1969 [62] contained this "ad-

---

**60.** Rescission is an acknowledged discretionary remedy for violations of these Securities Act sections. *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975); *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210, 213 (9th Cir. 1962), *after remand*, 333 F.2d 568 (9th Cir. 1964). Plaintiffs have not specifically requested rescissory relief under the federal Acts, but the interests of justice are served by the granting of such relief herein. There is no statute of limitations bar to the maintenance of these federal claims as the applicable time limitation is found in California Civil Procedure Code § 338 with respect to which defendants have waived all defenses as

discussed *supra*. *United California Bank v. Salik*, 481 F.2d 1012 (9th Cir. 1973).

**61.** 15 U.S.C. § 78t(a). Block is a control person liable under § 20(a) of the 1934 Act by virtue of his status as an active director and secretary-treasurer of UR as well as a substantial investor in and solicitor of sales for UR. This control status makes Block responsible under the statute for the wrongful actions of Byers. Plaintiffs have heretofore resolved their claims against Byers and Chaplin.

**62.** Exhibit 48.

vances" characterization. Moreover, in the absence of contrary evidence, I can only assume that Block himself, as UR secretary-treasurer, supplied that information to the accountants. Other relevant documentary evidence with which Block could be expected to have some familiarity include UR's October 15, 1968 application for an issuance permit [63] which did not include plaintiffs in its list of eligible investors and UR's February 25, 1969 application [64] for a permit that would cover the plaintiffs which, like the aforesaid financial statement, characterized plaintiffs' investments as corporate indebtedness which was to be cancelled upon the issuance of debentures and stock. The only logical reason to characterize what Block knew to be sales of securities as loans to UR would be to conceal the existence of these unlawful, premature sales. Byers' knowledge can be established by the same circumstantial evidence and more directly by his own admission in a March 7, 1969 letter to Chaykowsky in which he stated that UR had held Chaykowsky's $10,200 "as an open account until we received the permit yesterday to issue you your stock." [65]

Despite the abundance of documentary and testimonial evidence presented in this case, I find that the only knowing, material misrepresentations or omissions proved herein were those concerning the existence of an Oceanside franchise and the absence of authority to sell stock. These particular misrepresentations/omissions tainted only the above-indicated transactions, because the requisite permit and a Holiday Inn letter of commitment ("franchise" equivalent) were obtained thereafter, effectively removing the taint from subsequent transactions.

**63.** Exhibit 42(E).

**64.** *Exhibit* 42(A).

**65.** Exhibit 64(D).

**66.** Liability under the "control person" statute does not attach to Clayton for the acts of others under 15 U.S.C. §§ 77o and 78t, because he

## SUMMARY AND CONCLUSION

Defendant Block's liability embraces the following:

(1) Malik is entitled under § 17(a) of the 1933 Act, Rule 10B–5 and former § 25500 of the California Corporations Code to recover his $10,200 December, 1968 investment and is further entitled to recover under § 17(a) and Rule 10B–5 his $5,100 February, 1969 investment less $71.25 received as debenture interest payments—a total of $15,228.75.

(2) Chaykowsky is entitled under § 17(a) of the 1933 Act, Rule 10B–5 and § 1709 of the California Civil Code to recover his $10,200 January, 1969 investment less $47.50 received as debenture interest payments—a total of $10,152.50.

(3) Barish is entitled under § 17(a) of the 1933 Act and Rule 10B–5 to recover his $10,200 January, 1969 investment less $47.50 received as debenture interest payments, a total of $10,152.50.

◼ Clayton was, I believe, the most knowledgeable and experienced person involved in the UR venture, and it is difficult to believe that he was totally unaware of the unlawful solicitations and false representations to which plaintiffs fell victim; however, this notwithstanding, I am required to dismiss the complaint as to him for failure of proof. The evidence presented on the question of Clayton's knowledge of and involvement in the relevant UR activities is inconclusive.[66]

No evidence whatsoever has been adduced to establish liability on the part of defendant Clark arising out of either his own acts or the acts of others herein.[67]

Accordingly, the Clerk is directed to enter judgments against Block and in favor of

was not in a position to control the conduct of the UR officers in their dealings with investors. He was independent counsel consulted by UR but not actively involved in corporate affairs or solicitation of business for UR.

**67.** *See* note 7, *supra.*

plaintiffs Malik, Chaykowsky and Barish in the amounts of $15,228.75, $10,152.50 and $10,152.50 respectively with costs and interest at the rate of 7% per annum from the date of each plaintiff's payment(s) to UR with respect to which relief has been granted.[68]  Plaintiffs' causes of action against defendants Clark and Clayton are dismissed with prejudice and with costs in favor of said defendants.  The foregoing shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

---

**68.** The common law fraud count having been dismissed, plaintiffs' prayer for punitive damages need not be considered.