**Kenneth N. NELSON, Plaintiff-Appellant,**

v.

**O. E. SERWOLD and Helen Serwold, his wife, Defendants-Appellees.**

**Kenneth N. NELSON, Plaintiff-Appellee,**

v.

**O. E. SERWOLD and Helen Serwold, his wife, Defendants-Appellants.**

**Nos. 76–1001, 75–3833.**

United States Court of Appeals, Ninth Circuit.

April 3, 1978.

Rehearing En Banc Denied in No. 76–1001 June 26, 1978.

William D. Cameron (argued) of Williams, Lanza & Kasterner & Gibbs, Seattle, Wash., for Kenneth N. Nelson.

William A. Helsell (argued), of Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for O. E. and Helen Serwold.

Before KOELSCH and WRIGHT, Circuit Judges, and CALLISTER, District Judge.[*]

### PER CURIAM:

The plaintiff, Kenneth N. Nelson, was awarded $3,003.48 plus interest and costs in this 10b–5 action against defendants Serwold. They were found to have violated Rule 10b–5 of the regulations promulgated under § 10(b) of the 1934 Securities and Exchange Act (hereinafter "Act"), and its Washington counterpart, RCW § 21.20.010, by failing to reveal the existence of the "control group" under which 56% of a telephone company's stock, held in the name of O. E. Serwold, was in fact beneficially owned by Serwold and other members of the "group," and by failing to disclose an informal, long-range intent of the "control group" to modernize the telephone company and ultimately to sell it.

Plaintiff asserts on appeal that the district court erred by not basing relief on a rescissory theory of damages requiring a complete disgorgement of profits.

On their cross-appeal, defendants contend that the omissions in the representations made through their attorney were not material. They also insist that *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), decided after the district court's determination, requires reversal in light of the district court's finding of an absence of scienter.

We believe that the district court's finding that defendants failed to disclose material matters is amply supported by the evidence. We also believe the evidence supports a finding that the defendants acted knowingly or recklessly, a standard adequate to support Rule 10b–5 liability after *Ernst & Ernst.*

Finally, we reverse on the issue of damages, and remand so that the district court can recompute plaintiff's damages based on a rescissory theory. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

### FACTS

Poulsbo Rural Telephone Association (Poulsbo Telephone), a Washington corporation, was formed in 1908. Serwold was employed there as a lineman in the 1930's and became its president in 1957. He and his wife were directors of the company.

Serwold desired to modernize the company's equipment and install a dial system. He applied for a loan from Pacific Mutual Life Insurance Company in the mid-1950's. Poulsbo Telephone's attorney advised him to obtain "control" of the company so that he could deal effectively with the lender. Because he did not have funds to acquire control, he discussed the matter with social friends Rudie and Evelynn Iversen, William H. Gee, and J. Paul Coie. In 1956, the Serwolds, the Iversens, Gee, and Coie agreed to pool cash sufficient to acquire a controlling interest. Stock so acquired was to be owned of record by Serwold and beneficially owned as follows: approximately 30% for the Serwolds, 30% for the Iversens, 30% for Gee, and 10% for Coie. The group's desire to modernize was motivated, at least in part, by its plan to develop the company into a marketable enterprise. It acquired 56% of Poulsbo Telephone's stock as of 1959 and thereafter Serwold discontinued active efforts to acquire more stock.

On October 17, 1962, Earl A. Korth (Korth), a Wisconsin attorney, wrote to Poulsbo Telephone advising that stock certificate No. 305 for 36 shares issued to R. Norman had been found in his file in the Estate of Nels Nelson, Deceased. Korth asked information on the "status" of the

---

[*] Of the District of Idaho.

stock. Serwold referred the letter to Coie who responded on December 11, 1962 that, upon receipt of "satisfactory evidence of present ownership, we . . . may be in a position to offer $5.00 per share." No other information about the status of the stock was provided.

Korth wrote to Coie on January 22, 1963, showing ownership in the Nelson Estate and inquiring whether "any dividends . . are accrued." There was no response for 27 months, during which time the Nelson Estate was closed. The administrator, Herbert Nilsson, retained the certificate in a safe deposit box.

On April 15, 1965, Coie wrote Korth: If you will give us an affidavit and surrender Certificate # 305 for 36 shares . . ., the enclosed check of O. E. Serwold . . . in the sum of $180.00 may be cashed.

There have been no dividends ever declared since the formation of this company, and none can be anticipated for years because of mortgage commitments required to finance capital improvements. This is a regulated utility and there has never been a surplus from which dividends could have been declared.

In a letter to Nilsson on April 20, 1965, Korth indicated that he assumed that the $180.00 represented the fair market value of the stock. Coie received a copy of that letter. Nilsson relayed the information to the plaintiff. On July 9, 1965, Korth wrote Coie inquiring "whether or not Mr. Serwold would be willing to pay $250 [$6.94 per share] for the stock." Coie agreed and forwarded another Serwold check for the additional sum. In 1965, Poulsbo Telephone stock had a book value of approximately $60.00 per share.

Thereafter, on September 16, 1965, Korth mailed to Coie the endorsed stock certificate No. 305 and Nilsson's affidavit tracing ownership to the Nelson Estate.

Serwold, as president of Poulsbo Telephone, first received "feelers" in 1965 or 1966 from persons interested in purchasing all or part of the company's stock. In 1968 or 1969, Serwold and Telephone Utilities, Inc., of Ilwaco, Washington, discussed a possible sale of Poulsbo Telephone. Negotiations with United Utilities, Inc. (United), of Hood River, Oregon, began in December 1970, and resulted in the sale of all Poulsbo Telephone assets in 1971.

Under the Agreement and Plan of Reorganization, Poulsbo Telephone exchanged all its assets for United stock, which it then distributed to its shareholders. Poulsbo Telephone shareholders received 25 shares of United stock (a value of $500) for each share of Poulsbo Telephone. At the time of the exchange, Poulsbo Telephone stock had a book value of approximately $163.00 per share.

In 1971, plaintiff received a letter from Richard Peterson, R. Norman's nephew, alluding to the proposed transaction between Poulsbo Telephone and United. He then retained counsel and sued on June 20, 1972, having first obtained assignments from other relatives.

Over a two-year period the district court heard evidence and issued an oral opinion on September 20, 1974, a written opinion of October 25, 1974 as to liability, two letter-opinions on damages dated December 5, 1974, and January 23, 1975, and Findings of Fact and Conclusions of Law on September 29, 1975.

## DISCUSSION

### I. RULE 10b–5 LIABILITY.

#### *Material Omission*

■ Rule 10b–5 makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary . . . to make the statements made, in the light of the circumstances under which they were made, not misleading. . . ." 17 C.F.R. § 240.-10b–5. A statement or an omission is material if it reasonably could have been expected to influence the decision to sell. *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).

The district court concluded that Coie's representations to Korth with respect to (a) nondeclaration of dividends, (b) available surplus for dividends, and (c) mortgage restrictions on dividend payments did not amount to material misrepresentations which would expose defendants to Rule 10b–5 liability. The evidence supports these conclusions.

However, considering the disclosures in their entirety, the district court did find liability for material omissions, particularly for the defendants' failure to disclose the existence of the "control group," and the informal, long-range plan of the control group to acquire a majority of Poulsbo Telephone stock and build the company into a marketable entity. We agree.

Clearly, a "group" was formed to acquire control of Poulsbo Telephone. Equally clear is the fact that while Serwold appeared as owner of record of 56% of Poulsbo Telephone stock at the time of the sale, its beneficial ownership was divided among members of the "group."

The existence of a plan to acquire control of Poulsbo Telephone, strengthen and sell it is supported by the facts that the control group set out to acquire a majority of the stock; they ceased affirmative efforts to acquire stock after achieving control; they set out on a plan of modernization; they entertained "feelers" from and negotiated with potential purchasers of the company; and they eventually sold it for a substantial gain.

We find more than sufficient evidence to sustain the district court's findings of the existence of the control group and its long range plan. We also agree with the district court's conclusion that knowledge of these facts would have influenced a reasonable investor's conduct.

Defendants assert that the relationship between the attorneys representing the plaintiff and themselves was "casual." They so characterize it to justify their failure to disclose the existence of the "group," its long range objective to sell Poulsbo Telephone, and any additional financial information. Their position is not well taken. Korth, in his initial letter to Poulsbo Telephone, which Coie answered, requested information as to the "status" of the stock. "Status" suggests more detailed financial information than the general response "[W]e . . . may be in a position to offer $5.00 per share," especially in light of defendants' subsequent knowledge that the plaintiff erroneously assumed that $5.00 represented the fair market value of the stock. Even if Coie ignored the ramifications of Korth's use of "status," he could not ignore Korth's reliance on the $5.00 per share figure as its fair market value for his recommendations to the plaintiff.[1]

We agree with the district court's findings that the omissions, considered in their entirety, but with particular reference to nondisclosure of the control group and its long-range plan are material within the meaning of Rule 10b–5.

*Scienter*

The district court relied on *White v. Abrams,* 495 F.2d 724, 730, 734 (9th Cir. 1974), which rejected "scienter or any other discussion of state of mind as a necessary and separate element of a 10b–5 action." It also relied on *Myzel v. Fields,* 386 F.2d 718, 734, 747 (8th Cir. 1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), to support its finding of Rule 10b–5 liability without a showing of scienter.

After the district court's decision, however, the Supreme Court held that negligence is an insufficient basis for Rule 10b–5 liability. *Ernst & Ernst v. Hochfelder,* 425

---

1. It is strange that Serwold accepted a letter, addressed to the company of which he was president, from a stockholder inquiring as to the status of the stock, but did not respond in his capacity as a corporate officer. Nor did he have a representative of the company respond. *Instead, he turned the letter over to Coie, a* control group member and personal friend who at the time represented Serwold personally but did not represent the company. Then Serwold, in his personal capacity, offered to purchase and did purchase the shares from plaintiff with personal checks transmitted through Coie.

U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In rejecting negligence as a sufficient basis, the Court stated that some form of scienter was required.

Although it initially defined scienter as a "mental state embracing intent to deceive, manipulate, or defraud," *id.* at 193–94, 96 S.Ct. at 1381, the Court expressly limited that definition to the case before it. *Id.* at 193–94 n. 12, 96 S.Ct. 1375. It recognized that "[i]n certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act." *Id.* In doing so it expressly refused to consider whether "reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5." *Id.* Its succeeding terminology, analysis, and citation to authority, however, lend credence to a broad interpretation of scienter. Bucklo, *The Supreme Court Attempts to Define Scienter Under Rule 10b–5: Ernst & Ernst v. Hochfelder,* 29 Stan.L.Rev. 213, 218 (1977).

In his analysis of statutory language, Justice Powell apparently accepted a knowledge standard, concluding that the language "strongly suggest[s] that § 10(b) was intended to proscribe *knowing* or intentional misconduct." *Ernst & Ernst,* 425 U.S. at 197, 96 S.Ct. at 1383 (emphasis added). Also, the Securities & Exchange Commission's argument that "Congress must have intended to bar all such practices and not just those done *knowingly* or intentionally" strongly suggests that section 10b was intended, at a minimum, to proscribe knowing or intentional wrongdoing. *Id.* at 198, 96 S.Ct. at 1383 (emphasis added). In addition, we note that the Court cites no cases or commentaries indicating a requirement of strict common law intent. Bucklo, *supra* at 219 n. 30.

Although the Supreme Court left undecided the question whether recklessness is sufficient to support liability under Rule 10b–5, distinguished jurists have long considered it so. *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 868 (2nd Cir. 1968) (en banc) (Friendly, J., concurring), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 270 (3rd Cir.) (Adams, J., concurring and dissenting), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972). *See also* Loss, *Summary Remarks,* 30 Bus.Law. 163, 165–66 (Special Issue 1975) (commenting on *White v. Abrams* ). And since *Ernst & Ernst,* courts have continued to assess Rule 10b–5 liability for reckless behavior. *Bailey v. Meister Brau, Inc.* 535 F.2d 982, 993 (7th Cir. 1976); *McLean v. Alexander,* 420 F.Supp. 1057 (D.Del.1976).

■ *Ernst & Ernst,* we think, only went so far as to eliminate negligence as a basis for liability. We agree with those courts which have found that Congress intended the ambit of § 10(b) to reach a broad category of behavior, including knowing or reckless conduct.

The district court, operating without the benefit of *Ernst & Ernst,* found the nondisclosures of the defendants amounted to omissions prohibited by Rule 10b–5. It also stated, however, that the evidence did not justify a finding that the defendants "deliberately and cold-bloodedly set out to conceal information which 10b–5 requires to be provided." The language "deliberately and cold-bloodedly" suggests willfulness or a particularly aggravated intent.

The question remains whether the lower court found the defendants merely negligent, or whether it found their conduct more culpable than mere negligence, yet short of willful intent to defraud. Keeton, *Fraud: The Necessity of an Intent to Deceive,* 5 U.C.L.A.L.Rev. 585 (1958). The fact that the district judge never used the word "negligence," or any of its derivatives, in any of his findings of fact, conclusions of law, or opinions tends to indicate that he did not base his decision on a negligence theory.

■ The district court had sufficient evidence to find liability. It appears that the defendants' omissions were, at the very least, with knowledge. *Lanza v. Drexel & Co.,* 479 F.2d 1277 (2nd Cir. 1973). They knew of the control group, the outstanding,

but still indefinite, plans to sell after construction and improvement had conferred added value, and the steady and significant increases in earnings and book value in the few years between the seller's first inquiry and the ultimate sale of the 36 shares.

Knowledge of plaintiff's assumption that $5.00 per share represented the fair market value of the stock was imputable to the defendants because of the statements of their personal attorney. Alternatively, the district court could have found Coie reckless in his evaluation of the "status" of the stock, and imputed that recklessness to the defendants. The evidence supports a finding of recklessness, or some degree of intent not sufficiently aggravated to be characterized as "deliberate and cold-blooded." That would also be consistent with the district court's findings.

## II. DAMAGES.

Having found an absence of "scienter" (i. e., "deliberate and cold-blooded intent"), the district court based damages on the highest value for the shares as of December 31, 1967, which it concluded was a reasonable time after the transaction. The court awarded $3,003.48 ($83.43 per share) plus interest and costs. We believe the district court erred in its choice of the theory upon which it computed damages.

Although there is no express enumeration of remedies under Rule 10b–5, it is clear that a plaintiff may sue for money damages. Because few cases have gone to final judgment, the law in this area is still in a formative, somewhat confused state. The early cases generally awarded the differ-

ence between the value given and the value received, but the recent trend looks to defendant's profits, rather than to plaintiff's losses, in measuring damages. R. W. Jennings & H. Marsh, Jr., Securities Regulation 1085–88 (4th ed. 1977).

For example, in *Janigan v. Taylor,* 344 F.2d 781 (1st Cir. 1965), the court included in damages the profits realized by insiders in the form of accretion. Similarly, in *Myzel v. Fields,* 386 F.2d 718 (1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968), the Eighth Circuit, relying on *Janigan,* dismissed a defendant's argument that an instruction to the jury permitting an award on the basis of defendant's gain rather than plaintiff's loss violated § 28(a)'s command that only actual damages be recoverable.[2]

The Supreme Court, relying on *Janigan* and *Myzel,* stated the rule for the measure of damages for defrauded sellers in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741:

> In our view, the correct measure of damages under section 28 of the Act . . . is the difference between the fair value of all that the . . . seller received and the fair value of what he would have received had there been no fraudulent conduct . . . *except for the situation where the defendant received more than the seller's actual loss. In the latter case damages are the amount of the defendant's profit.* (Emphasis added.)

This rule provides full compensation for injury caused by fraudulent conduct, and, significantly, it removes all incentive to engage in such conduct.[3] It results in

---

2. Defendants claim *Myzel* cannot be authority for applying the disgorgement theory, because that court gave an instruction referring to "reasonable period after the fraudulent transaction." The actual instruction, however, provided:

> What constitutes a reasonable period is for you to determine upon all the facts of this case. You should bear in mind that the statute is not intended to provide investors with an insurance policy against market changes. *It does, however, seek to prevent those who have engaged in fraudulent or illegal conduct from benefiting by that conduct.*

386 F.2d 745 n. 23 (emphasis added).

3. The only possible exception to this rule, noted in *Janigan* upon which the Court relied, is a subsequent increase in the value of the stock attributable to special or unique efforts of the fraudulent party other than those for which he is duly compensated.

The record, however, fails to show the accretion in Poulsbo Telephone stock values was caused by defendants' "extraordinary contributions." Serwold was a director and president of the company, and his wife was a director. To the degree they did modernize Poulsbo Telephone and effect the sale, they were acting in their compensated corporate capacities.

the "simple equity that a wrongdoer should disgorge his fraudulent enrichment." *Janigan v. Taylor,* 344 F.2d at 786. The instant case falls within the rule of *Affiliated Ute Citizens*: because the defendant's gain is greater than the seller's loss,[4] damages are the amount of the defendant's profit.[5]

Defendants strenuously argue that the disgorgement theory is harsh and applicable only to instances of conscious, affirmative misrepresentations as opposed to mere omissions, as in this case. They argue that to award profits accrued over such a long time makes the fraudulent buyer an insurer against adverse market fluctuations. We are not persuaded.

First, we see no harshness in a remedy which takes from a fraudulent actor what was generated by his conduct. *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1342 (9th Cir. 1976) (Sneed, J., concurring); *Myzel v. Fields,* 386 F.2d 718, 747 (8th Cir. 1967); *Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir. 1965). To allow violators of the Act to profit by their misconduct would undermine the deterrence that the Act was intended to effect.

Secondly, the remedial section, 28(a), does not distinguish between misrepresentations by affirmation and omission. There is no logical basis for such a distinction. This is especially so in the context of the overall statutory scheme of full disclosure. Either kind of misrepresentation is a means by which one can defraud another, and an omission can be as intentional as an affirmation.

Finally, we find that to refuse to award all of the accretion in value through the date of the discovery of the fraud would reward those who conceal their misconduct. We agree with *Janigan v. Taylor,* 344 F.2d at 786, that "[i]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them."

Judge Sneed recently articulated the theoretical model underlying the disgorgement theory. *Green v. Occidental Petroleum Corp.,* 541 F.2d 1335, 1342 (9th Cir. 1976) (concurring opinion). He explained:

> [T]he rescissory measure of damages . . . in theory . . . contemplates a return of the injured party to the position he occupied before he was induced by wrongful conduct to enter the transaction. Assuming a sale and purchase of stock, true rescission would involve a return, on the one hand, of the purchase price and, on the other, of the stock purchased. In many instances, however, the purchaser no longer possesses the stock when rescission is sought. Under those circumstances only the monetary equivalent of the stock can be returned.
>
> To adhere to the model of rescission the monetary equivalent should be determined as of the date the purchaser was under a present duty to return the stock, *viz.* the day of judgment. *See* Note, The Measure of Damages in Rule 10b–5 Cases Involving Actively Traded Securities, 26

---

4. Defendant's profit was roughly $495 per share ($500 worth of United stock received less their cost of $5 per share of Poulsbo Telephone), as opposed to plaintiff's loss at the time of the transaction, which was approximately $55 per share ($60 book value less $5 received).

5. Although we conclude this case clearly falls within the exception to the *Affiliated Ute Citizens* rule, we also believe the result follows from the general rule of the case. Had there been no fraudulent conduct, the evidence could support a finding that plaintiff would not have sold the Poulsbo Telephone stock until the

company was sold to United. Treating the shares as "historical curiosities," the administrator kept them in a safe deposit box. Absent the April 15, 1965, letter from Coie, it is likely the certificate would have remained in the Wisconsin safe deposit box until the sale to United. Hence, had there been no fraudulent conduct, the plaintiff would have received stock in United valued at $500 per share of Poulsbo Telephone, rather than the $5 per share that he received in the fraudulent exchange. The circumstances would seem to justify awarding any accretions in value through the date of the sale to United.

Stan.L.Rev. 371, 372 (1974). The courts generally, however, do not use the date of judgment but employ an earlier post-transaction date, such as the date of disclosure of the fraud. *Id.*

This measure [purchase price less value at the time of disclosure] works justly when a defrauded *seller* proceeds after an *increase* in value of the stock against a fraudulent buyer who is unable to return the stock he fraudulently purchased. His inability to return the stock should not deprive the injured seller of the remedy of restitution. Under these circumstances it is appropriate to require the fraudulent buyer to account for his "ill-gotten profits" derived from an increase in the value of the stock following his acquisition of the stock. *See Janigan v. Taylor*, 344 F.2d 781 (1st Cir. 1965). *See also Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). Only in this manner can the seller be put in the position he occupied before the contract was made. *Cf.* 5 Corbin on Contracts, § 1112 (1964).

The sale of Poulsbo Telephone's assets to United precipitated the discovery of the fraud and it is reasonable to fix that as the date of discovery. Plaintiff should be awarded defendants' profits derived from the sale to United.

We reverse and remand for a determination of damages consistent with this opinion.