SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

The SEABOARD CORPORATION, etc., et al., Defendants.

ADMIRALTY FUND and Admiralty Fund Growth Series Litigation Trust, Cross-Claimant/Appellant,

v.

HUGH JOHNSON & COMPANY, INC., Hugh Johnson, Norman Michael Keiser, and Ernst & Ernst, Cross-Defendants/Appellees.

Nos. 79–3820, 79–3821.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 8, 1981.

Decided May 24, 1982.

Stephen H. Marcus, Greenberg, Bernhard, Weiss & Karma, Los Angeles, Cal., for plaintiff.

Allen H. Beroza, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, N. Y., Joseph J. O'Malley, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for cross-defendants/appellees.

Before WRIGHT and WALLACE, Circuit Judges, and EAST,* Senior District Judge.

EUGENE A. WRIGHT, Circuit Judge:

This is an appeal of summary judgment for cross-defendants Ernst & Ernst, Hugh Johnson & Co., Hugh Johnson, and N. Mi-

* Of the District of Oregon.

chael Keiser. Ernst & Ernst and the "Hugh Johnson defendants" (hereinafter HJ) appealed separately. We consolidate them because the claims against them arise from the same facts.

## FACTUAL BACKGROUND

This is one of several appeals arising from a 92-page SEC complaint against The Seaboard Corporation, its subsidiaries, and other parties (including officers and directors of Seaboard or its subsidiaries) for securities law violations. Competitive Capital Fund, Inc., Seaboard Leverage Fund, Inc., Admiralty Fund, Inc., and the Income Fund of Boston, Inc., all mutual funds and subsidiaries of Seaboard (hereinafter Funds), cross-claimed against fellow and added defendants involved in the transactions that were the subject matter of the SEC complaint, and which resulted in harm to the Funds.

The transaction that led to this appeal was the purchase by Admiralty Fund (hereinafter AF) of shares of Dukor Modular Systems (hereinafter DMS). AF's purchase of shares of DMS was one of several transactions in which Jerome R. Randolph, then president and director of Seaboard and its subsidiaries, and others looted Fund assets.

The SEC complaint alleged that Randolph, John R. Rawlings, and Harry B. Turner[1] with the aid of Morgan Olmstead Kennedy & Gardner, Inc. (hereinafter Morgan), used the assets of AF to manipulate the market for DMS shares. This occurred during and after an offering of DMS shares to the public.

On December 22, 1970, DMS floated an offering of 350,000 shares at $10 each. Randolph purchased 50,000 shares for AF. At the same time he directed Turner to buy 7,500 shares. From December 22, 1970 to April 1, 1971 he caused AF to purchase 42,000 more shares of DMS pursuant to an agreement with Morgan, one of the underwriters of the DMS issue.

These purchases allegedly supported the DMS aftermarket and allowed Randolph, Rawlings, and Turner to sell their shares at a profit. AF's DMS holdings, however, were not sold until after Randolph left Seaboard and the Funds in 1972. They were sold at a loss of $1,016,675 on an initial investment of $1,021,825.

On March 11, 1974, the Funds filed cross-claims incorporating the SEC complaint and alleging generally violations of the securities acts that resulted in more than $10 million of damage to the Funds' assets. The cross-claims were amended to add more cross-defendants, among which were the HJ defendants, Hugh Johnson & Co., Hugh Johnson, and Norman Keiser.[2] In their second amended cross-claims, the Funds alleged with greater particularity the violations against them and added Ernst & Ernst.

In count 4 of the second amended cross-claims, AF realleged the market manipulation by Randolph, Rawlings and Turner. Further, it alleged that its purchases and the DMS distribution as a whole were pursuant to a conspiracy between Randolph, DMS, Morgan, Ernst & Ernst and others.[3]

Pursuant to this alleged conspiracy, DMS filed a registration statement and prospectus precedent to the offering, which contained these misrepresentations and omissions: (1) they failed to disclose the scheme for distributing DMS shares; (2) they failed to disclose that DMS was in financial straits; (3) they overstated DMS's net worth by at least $500,000; (4) they failed to disclose anticipated losses on incompleted projects; (5) they stated that DMS had over

---

**1.** Rawlings and Turner were alleged to be nominees, financiers, and coventurers with Randolph. Neither was associated with Seaboard or its subsidiaries.

**2.** We were informed at oral argument that Hugh Johnson has died and that Hugh Johnson & Co. is defunct. Only Keiser, a control person of Hugh Johnson & Co., has filed a brief in this appeal.

**3.** HJ defendants are not specifically named as part of the conspiracy though they have been treated as if they were. Hugh Johnson & Co. was alleged to have violated § 15(b)(4)(E) of the Exchange Act by failing to supervise Johnson and Keiser. We do not consider this claim on appeal because AF does not press it.

$12 million in back orders, while in reality the firm back orders amounted to much less; (6) they failed to disclose that backlog customers were unlikely to fulfill their obligations because of limited resources and conditions precedent to their obligations to DMS; (7) they failed to disclose that the primary backlog customer, Arbor Development Co. (hereinafter Arbor), was in such financial difficulty that it could not pay for its back orders and was in fact controlled by DMS.

These misrepresentations and omissions were alleged to be a cause for AF's purchase of DMS shares because Randolph, notwithstanding his personal motivations, relied upon the prospectus in directing the purchases. Ernst & Ernst and HJ were added because of their participation in the preparation of the registration materials and in the offering itself. HJ and Morgan were the underwriters of the offering, and Ernst & Ernst certified the financial statements contained in the prospectus. In response to the second amended cross-claims, Ernst & Ernst and HJ acknowledged their roles in the offering, but denied wrongdoing. Both moved for summary judgment.

In support of its motion, Ernst & Ernst argued that the statutes of limitations barred claims for violation of the securities provisions upon which AF relied. In the alternative, it argued that its work for DMS had complied with generally accepted accounting standards. It presented the affidavit of its auditor, James Maxwell. HJ relied only upon the bar of the statutes of limitations to support its motion.

In response, AF filed memoranda arguing the infirmity of the statute of limitations defense and asserting facts, supported by citations to documents and depositions on file, to show the existence of issues of material fact. Ernst & Ernst and HJ were

allowed to file response memoranda. AF then filed a reply and a supplemental memorandum of points and authorities in opposition to all motions for summary judgment. Ernst & Ernst objected to the filing of these unscheduled memoranda and its motion to strike was granted.

The court granted summary judgment for all count 4 defendants. Its judgment was based primarily on the finding that the claims brought by AF were barred by statutes of limitations. Alternatively, it concluded that even if the claims were not so barred, the prospectus was not, as a matter of law, misleading.

In behalf of Ernst & Ernst, the court further found that its defense of compliance with generally accepted accounting principles was good because no evidence to the contrary had been introduced. And the court found no evidence that Ernst & Ernst or HJ has conspired with Randolph to defraud the funds.[4]

On appeal, AF raises these issues: (1) whether the summary judgment for Ernst & Ernst and HJ was improperly granted on the ground that the prospectus was not materially misleading as a matter of law; (2) whether it was improperly granted on the ground that AF's claims are barred by the statutes of limitations; (3) whether summary judgment for Ernst & Ernst was improperly granted on the basis of its defense of compliance with generally accepted accounting principles; and (4) whether the court erred in striking AF's unscheduled reply memorandum.

## DISCUSSION

Summary judgment is proper only when (1) the pleadings, depositions, affidavits, and other material permitted by Rule 56(c), show that there is no disputed issue of material fact, and (2) on the agreed facts, the moving party is entitled to prevail as a

---

**4.** These findings were announced from the bench. Pursuant to them, more explicit "findings of undisputed fact" and conclusions of law were submitted and signed.

Though these "findings" are useful, we are not constrained by them. Fed.R.Civ.P. 52(a) states they are not required. They are entitled to no deference on review. *See Garter-Bare*

*Co. v. Munsingwear, Inc.*, 650 F.2d 975, 980 (9th Cir. 1980).

It has been noted that they are not "findings" in the traditional sense. They constitute only a "finding" by the trial judge that no genuine issue of fact exists regarding the fact described, providing on review a guide to the grounds upon which he based his judgment. *See id.* at 983. (Wallace, J., concurring).

matter of law. Fed.R.Civ.P. 56(c); *Pegasus Fund, Inc. v. Laraneta*, 617 F.2d 1335, 1339 (9th Cir. 1980). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth. *United States v. First National Bank*, 652 F.2d 882, 887 (9th Cir. 1981).

The well known principles controlling summary judgments apply here. *Adickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

## I. *The Prospectus*

Admiralty Fund's claims against Ernst & Ernst and HJ are based upon §§ 11 and 12(2) of the 1933 Securities Act [15 U.S.C. §§ 77k and 77*l*(2)], § 10(b) of the 1934 Exchange Act and its companion Rule 10b–5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5], §§ 25400–25402 of the California Corporations Code, and common law fraud. These claims are predicated upon the allegation that the DMS prospectus was materially misleading.[5]

Our first inquiry is whether the court could properly grant on this record summary judgment because the prospectus was not misleading as a matter of law.

■ We have adopted an objective test of materiality described in *Northwest Paper Corp. v. Thompson*, 421 F.2d 137 (9th Cir. 1969). We continue with it notwithstanding the Supreme Court's articulation of more permissive standards. *See Lewelling v. First California Co.*, 564 F.2d 1277, 1279 n.3 (9th Cir. 1977).

■ It is whether the existence or nonexistence of the fact in question is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction. *Northwest Paper Corp. v. Thompson*, 421 F.2d at 138. This is normally a jury question and should not be taken from it unless the court has engaged in meticulous and well articulated analysis

of each item of withheld or misrepresented information. *Id.*

In support of their motions, neither Ernst & Ernst nor HJ argued explicitly that the prospectus was not misleading. Both asserted as their principal defense the statutes of limitations.

Ernst & Ernst alternatively argued that it had conformed to generally accepted accounting principles, implying that the parts of the prospectus for which it was responsible were not materially misleading. In response, AF argued that the prospectus was materially misleading because it generally gave a false impression of a company that had a firm backlog of orders and enjoyed consistent economic health through the effective date of the prospectus.

Relying on discovered documents and depositions, AF presented a picture more detailed than the general allegations of its complaint.

During the offering itself, and only eight days after the effective date of the DMS prospectus, DMS reported more than a $3.5 million drop in its backlog, a decrease not reflected in sales revenue figures. The reported sales figures in fact showed a dramatic drop in sales revenues during the last two months of 1970.

The backlog was also suspect because the prospectus represented that Arbor was unaffiliated with DMS. On the contrary, it was an assetless shell organized and controlled by DMS. The prospectus also failed to disclose that Morgan had ordered a private investigation of Arbor's primary officer, Thomas Gamboa, which revealed within a week before the prospectus effective date that he had been the subject of several suits and two cease and desist orders issued by the California Real Estate Board.

Beyond that, the prospectus misrepresented Gamboa's true association with DMS. It described him as a consultant, while in reality he was paid $25,000 per year "contingent" upon his solicitation of production contracts.

---

5. Though it was alleged below that the misleading character and purpose of the prospectus was part of the overall conspiracy to defraud AF, this point is not raised on appeal. Even if

it were, we would uphold the district court's determination that, because no evidence was presented, there was no conspiracy as a matter of law.

Notes discovered from Morgan showed that many of the projects represented in the backlog were uncertain. Developers of some held only options on the land on which DMS modules were to be erected. Others did not have local approval.

Other prospectus figures portrayed an "unduly optimistic picture" of DMS's financial condition and concealed adverse facts because the financial statements were based upon a period ending October 31, 1970.

That created the impression that DMS suffered no material changes in its financial condition before the effective date of the prospectus. Sales revenues, reported in the prospectus as $420,210 for June 1 through October 31, 1970, dropped to only $5,000 for the last two months.

This could be partially explained by the fact that most of DMS revenues for the period reflected in the financial statements had come from a single project, which by October 31 was 99% completed. Further, the selection of the cutoff date concealed a rate of loss during the last two months of the year that was three times greater than that reported for the financial statements' accounting period.

The prospectus also failed to report that as of November 1970 DMS was in financial trouble and looking to the offering to delay inevitable bankruptcy.

The loss figure in the prospectus was misleading because the "unrecovered promotional and development costs" of $301,-504 were reported as an asset rather than as a cost. The production figure overstated production as being five modules per day when in reality DMS was producing less than one per day. And sales revenues were reported at $100,000 more than those reported later for the period ending December 31, 1970.

Because the district court said only that "the prospectus did not, as a matter of law, contain misstatements as charged by the Funds or omit facts necessary in light of what was stated," we are left to speculate about the basis for its judgment that no material issue exists on this record.

It reasoned perhaps that the prospectus contained sufficient qualifying language and that the alleged misrepresentations and omissions were therefore not material. It may have determined that the apparent scheme between Randolph, Rawlings, Turner and Morgan was the true cause of the harm to AF. Or perhaps it found that AF had not supplied Rule 56(c) materials sufficient to meet its burden.

Though we would agree that its arguments are based upon thin documentation, viewing the record in a light most favorable to AF,[6] we find that it has presented sufficient evidence at least to raise an issue of fact.

Though it is true that backlog figures are inherently suspicious, the evidence viewed favorably to AF suggests that the DMS prospectus figures were artificially inflated. It is also true that financial statements convey only a static view of a defined accounting period and do not insure that a suggested trend will continue. But the selection of the accounting period may be materially misleading if it precedes an expected downturn.[7]

## II. *Ernst & Ernst*

█ A defense is properly asserted in a motion for summary judgment to show that

---

**6.** Documents relied upon are not authenticated by affidavit. Depositions that were presumably before the trial court are not to be found in the record on appeal. Those we do find do not support clearly the propositions for which they are cited.

**7.** On the other hand, we believe the trial court could find that no material issue existed regarding the report of the promotional and developmental costs and that the defendants were entitled to prevail on this point as a matter of law.

Their treatment as a cost is adequately explained in the footnotes to the financial statements if viewed in conjunction with the balance sheet.

No more than a rudimentary understanding of accounting principles is needed to understand the effect of this reporting method on the overall financial character of the company. Moreover, AF has not adequately countered evidence that the reporting itself was in compliance with SEC directive. *See infra.*

the defendant is entitled to judgment as a matter of law. The motion will be granted if it raises at least one legally sufficient defense to bar the plaintiff's claim and no triable issue of fact relates to that defense. If the moving party's defense is legally inadequate or would require the adjudication of fact issues, the motion will be denied. C. Wright & A. Miller, *Federal Practice and Procedure*, § 2734 at 647–48 (1973).

### A. Ernst & Ernst's Statute of Limitations Defense

We first consider the statute of limitations defense.[8]

█ 1. *Sections 11 and 12(2) of the 1933 Securities Act.* Section 13 of the 1933 Act dictates that an action under § 11 or § 12(2) must be brought within one year after the discovery of the untrue statement or omission, or after discovery should have been made by the exercise of reasonable diligence. In no event can an action be brought under § 11 more than three years after the security was offered to the public. Similarly, an action under § 12(2) may not be brought more than three years after sale. 15 U.S.C. § 77m.

There is no issue that the offer of DMS securities occurred December 22, 1970, or that sales to Admiralty Fund continued through approximately April 1971. The cross-claim against Ernst & Ernst was filed June 25, 1975, more than three years from the time of offer or sale.

Admiralty Fund argues that § 13 was tolled because the fraud was actively concealed and that it did not discover Ernst & Ernst's wrongdoing until October 10, 1974, the date of the SEC complaint. We disagree.

Though some courts have applied equitable principles to toll the statute, *see, e.g., In re Home-Stake Production Co. Securities Litigation*, 76 F.R.D. 337, 344–45 (N.D.Okl. 1975), we believe the statutory language requires the conclusion that Congress meant the bar to be absolute. *Accord, Brick v. Dominion Mortgage & Realty Trust*, 442 F.Supp. 283, 289–91 (W.D.N.Y. 1977); *Cowsar v. Regional Recreations, Inc.*, 65 F.R.D. 394, 397 (M.D.La.1974).

No factual issue remains as to the three-year bar of § 13. The district court could properly rule that as a matter of law claims against Ernst & Ernst under §§ 11 and 12(2) were barred by § 13 and grant summary judgment.

### 2. California Corporations Code §§ 25400–25402

█ Civil liability for violations of Cal. Corp.Code §§ 25400–25402 is provided for in §§ 25500–25502. Section 25506 contains a statute of limitations similar to § 13 of the 1933 Act. It bars actions brought under §§ 25500, 25501, or 25502 after four years from the offending act or transaction, or after one year from the plaintiff's discovery of the facts constituting the violation.

If this statute acts as an absolute bar, then we must conclude that summary judgment was proper regarding Admiralty Fund's pendent claims under §§ 25400–25402 and 25500–25502.

Nothing suggests to us that the interpretation of this statute should differ from that of § 13 of the 1933 Act. The plain language indicates that the four-year bar is absolute. At least one court has so concluded. *See Malik v. Universal Resources Corp.*, 425 F.Supp. 350, 361 (S.D.Cal.1976).

The district court could find that Ernst & Ernst was entitled to summary judgment as a matter of law on these claims.

### 3. Section 10(b) of the 1934 Exchange Act, and Common Law Fraud

█ The statute of limitations applicable to claims under § 10(b) of the 1934 Exchange Act and for common law fraud is the state statute applicable to frauds gener-

---

8. Crucial to this defense are the operative dates for the running of the statutory periods. Ernst & Ernst argued that the date for the running of the statutes is the date of the filing of the second amended cross-claim, June 25, 1975, when Ernst & Ernst was added to the action. Admiralty Fund appears to have conceded that this is the proper date, and that its second amended cross-claims do not relate back to its initial cross-claims filed March 11, 1974.

ally, Cal.Civ.Proc. Code § 338. *See United California Bank v. Salik*, 481 F.2d 1012 (9th Cir.), *cert. denied*, 414 U.S. 1004, 94 S.Ct. 361, 38 L.Ed.2d 240 (1973). Section 338(4) prescribes a three-year limitations period from the date of discovery of the fraud or mistake.[9]

Supporting its motion for summary judgment, Ernst & Ernst argued that Admiralty Fund had notice of the alleged fraud and misleading character of the prospectus more than three years before the June 25, 1975 filing of its cross-claim against Ernst & Ernst. Admiralty Fund responded that it had no notice of the fraud until the filing of the SEC suit.

Ernst & Ernst sought judgment based on these facts:

(1) On October 13, 1971, Randolph instructed AF and Seaboard lawyers to inspect the prospectus, after which at least one of the lawyers reviewed DMS's SEC filings;

(2) About October 13, 1971, AF received copies of the SEC filings from the Washington Service Bureau;

(3) Early in 1972, Dillingham of Morgan told Randolph that the DMS backlog had "suffered a substantial deterioration";

(4) About August 23, 1972, Randolph's successor at AF received copies of the 1971 and 1972 DMS financial statements;

(5) The value of DMS stock dropped dramatically during 1971–72, which loss was reflected in AF's own valuation of the stock;

(6) AF sold all of its stock at a loss in November 1972;

(7) The officers and board of directors of AF periodically reviewed the DMS stock;

(8) There was an immediate dilution of $7.24 per share at the initial sale; and

(9) On December 31, 1971, the value of DMS stock more than doubled, but declined the following day.

AF presented the affidavit of Alan Markizon, former counsel to AF, which stated:

(1) AF investment decisions were under Randolph's sole control until his departure on June 30, 1972;

(2) Markizon learned only early in 1973 of an SEC investigation, which led him to be concerned about the propriety of the DMS purchases;

(3) At a meeting with representatives of Morgan and their counsel on May 1, 1973, Markizon was assured that the backlog contracts had been verified and that there had been no improprieties;

(4) Randolph may have earlier "mentioned" the possibility of misrepresentation of the backlog in the prospectus, but this was based only on rumor and was not a sufficient basis for positive action.

Counsel for AF in this litigation swore that he did not learn that the prospectus contained misleading information until he met with an SEC attorney in September 1974.

■ Though we have held that the state statute of limitations is to be applied in an action brought under § 10(b), federal law determines when the statute starts to run. This is true even though the federal rule that the period commences when the plaintiff discovered or could have discovered the fraud with the exercise of reasonable diligence is similar if not identical to state law. *Hilton v. Mumaw*, 522 F.2d 588, 601–02 (9th Cir. 1975). We have held further that the question of when the fraud is discovered is for the trier of fact. *Id.* at 602; *Briskin v. Ernst & Ernst*, 589 F.2d 1363 (9th Cir. 1978), *Cf. Ohio v. Peterson, Lowry, Rall, Barber & Ross*, 651 F.2d 687 (10th Cir. 1981) (because tolling is equitable doctrine, judge may decide).

■ Because our precedent dictates that the question of notice of fraud is for the trier of fact, the party seeking summa-

---

**9.** Admiralty Fund also asserts a claim against Ernst & Ernst for violation of § 15 of the 1934 Act (15 U.S.C. § 78*o*). If Admiralty Fund had a claim against Ernst & Ernst under this section, Cal.Civ.Proc.Code § 338(4) would proba-

bly apply. *See Bohem v. Butcher & Singer*, 427 F.Supp. 355 (E.D.Pa.1977). We do not decide the issue because we decide that Admiralty Fund does not have a claim under § 15.

ry disposition has an extremely difficult burden to show that there exists no issue of material fact regarding notice. Though it may appear that Ernst & Ernst has met this burden, we find no support in the record for several of the factual assertions advanced and then found by the trial court to be "undisputed facts." [10]

Reviewing the balance of Ernst & Ernst's factual assertions in a light most favorable to AF, regarding the assertions of AF's affidavits as being true, and aware that summary disposition of this issue is discouraged, we hold that the district court improperly granted summary judgment on the basis that AF's § 10(b) claim was time barred. There exists a factual issue regarding AF's discovery of the fraud. The district court could not find as a matter of law that discovery antedated June 25, 1972.

 Randolph's knowledge, the important factor, cannot be imputed to AF because he was alleged to be a participant in the fraud against it. *See Peterson v. Tharp*, 299 F.2d 434 (5th Cir.), *cert. denied*, 371 U.S. 889, 83 S.Ct. 184, 9 L.Ed.2d 122 (1962). The accounts of Randolph's passing on any of his information are too vague to establish a date of discovery.

Nor does the record show when the 10K report was filed or if any AF officers actually became aware of it. *See Briskin v. Ernst & Ernst*, 589 F.2d at 1368 (whether plaintiffs should have investigated SEC filing was a question for fact finder). The fluctuation in value of DMS stock did not necessarily point to the alleged financial weakness of DMS at the time of the sale. General market conditions, subsequent events, or the inherent risk of the business could have been responsible. *See id.*

Even if the parties' alternative interpretations were doubtful, the question of what a reasonable investor would have done is not so certain as to allow a determination as a matter of law. *See id.* (impact of 85% loss of value a question for fact finder).

Although Randolph told Markizon of his suspicions, this apparently preceded Markizon's action in calling a meeting with one underwriter and its counsel on May 1, 1973, at which time he received specific assurances that the DMS backlog figures had been investigated. Whether this constituted reasonable diligence after the warning is uncertain.

This analysis convinces us that on this record the issue of discovery of the fraud was not ripe for summary disposition.

### B. *Ernst & Ernst's Scienter*

Having decided that the statute of limitations does not provide sufficient basis for summary judgment in favor of Ernst & Ernst on AF's § 10(b) claim, we turn to the issue of its scienter.

Section 10(b) provides that it is unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5, promulgated under § 10(b), provides that it is unlawful for any person, directly or indirectly

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

 A private right of action has been implied in the provisions of this section and rule.[11] It is also settled that proof of scien-

---

10. The assertions that Randolph directed an investigation of SEC findings, that AF received copies of filings, that Randolph's successor received copies of DMS's 1971 and 1972 financial statements, and that AF officers and directors

periodically reviewed the DMS stock do not find support in the record.

11. A private right of action was first implied in *Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D.Pa.1946). The Supreme Court has

ter is required to make out a cause of action. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The Supreme Court has defined "scienter" as "intent to deceive, manipulate, or defraud," but specifically left open the question whether, in some circumstances, recklessness will fulfill the requirement. *Id.* at 194 n.12, 96 S.Ct. at 1381 n.12. We have decided that it will. *Nelson v. Serwold*, 576 F.2d 1332 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).

Secondary liability has also been implied under the section and rule. Tort and criminal theories have supported the implication of aider and abettor, coconspirator, and respondeat superior liability. We concern ourselves here only with potential liability for aiding and abetting.

At least one court has enumerated its elements as being: (1) some other party has committed a securities law violation, (2) the accused party had general awareness that his role was part of an overall activity that is improper, and (3) the accused knowingly and substantially assisted the violation.

*Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94–5 (5th Cir. 1975) (citations omitted).[12]

In support of its motion, Ernst & Ernst presented the affidavit of the auditor in charge of the audit of the financial statements in the DMS registration statement and prospectus. It stated that the audit had been performed in accordance with generally accepted accounting standards.[13] Pursuant to these standards, enumerated procedures were followed to assure the accuracy of the financial statements.

The affidavit stated explicitly that the backlog was not audited and explained that a backlog is not susceptible of audit because there is no way to verify supporting financial data. To support the proposition that any certification of the backlog figure would be misleading, Maxwell argued, as an example, that if DMS management had additional construction contracts with different parties, but failed to report them to the accounting firm, there would be no means of discovering them. For further support he authenticated and attached a copy of

acknowledged that "the existence of a private cause of action for violations of the statute and the Rule is now well established." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730, 95 S.Ct. 1917, 1922, 44 L.Ed.2d 539 (1975); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 150–54, 92 S.Ct. 1456, 1470–1472, 31 L.Ed.2d 741 (1972); *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13 n.9, 92 S.Ct. 165, 169 n.9, 30 L.Ed.2d 128 (1971)).

12. The parties here assume that there is potential aiding and abetting liability. Though we have suggested that there may be aiding and abetting liability under the securities acts, *see Strong v. France*, 474 F.2d 747, 752 (9th Cir. 1973), we have not directly confronted the issue. On the record before us, we decline to do so now.

Aiding and abetting and other "add-on" theories of liability have been justified by reference to the broad policy objectives of the securities acts. *See generally* Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, etc.*, 120 U.Pa.L.Rev. 597 (1972).

The Supreme Court has rejected this justification for an expansive reading of the statutes and instead prescribed a strict statutory con-

struction approach to determining liability under the acts. *See, e.g., Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

Noting the Supreme Court's new approach to the implication of rights of action under the acts, Professor Fischel has said that if confronted with the issue now, the Court would probably not recognize secondary liability theories as valid. He argues in fact that *Ernst & Ernst v. Hochfelder, supra,* implicitly holds that aiding and abetting liability does not exist as an area of liability distinct from liability that could be imposed for a direct violation of the section and rule. *See* Fischel, *Secondary Liability Under Section 10(b) of the Securities Act of 1934,* 69 Cal.L.Rev. 80 (1981).

13. "Generally accepted accounting standards" are general standards of conduct relating to the auditor's professional qualities and to the judgments exercised by him in the performance of his examination and report. *See SEC v. Arthur Young & Co.*, 590 F.2d 785, 788 n.2 (9th Cir. 1979) (citing AICPA, Professional Standards, *Statements on Auditing Standards* No. 1, § 150.01.0).

AICPA accounting standards that specifically ordered accountants not to comment on backlogs.

The affidavit explained further that the treatment of the developmental and promotional costs was in accordance with direction from the SEC itself. Regarding the extent of Ernst & Ernst's participation in the preparation of the prospectus, Maxwell swore that to the best of his recollection no one from Ernst & Ernst attended due diligence meetings with the underwriters.

To attend such meetings, where registration documents are reviewed for compliance with federal and state reporting requirements, was contrary to the firm's practice. Ernst & Ernst reviewed the registration documents only for the purpose of insuring that no fact was being reported contrary to those of the financial statements.

In response, AF presented these facts to suggest that Ernst & Ernst's involvement exceeded mere audit of the financial statements and that it knew of the material misrepresentations and omissions:

(1) Ernst & Ernst had responsibility for preparation of all financial information to be included in the prospectus;

(2) Its employees chose the October 31 cutoff date even though they knew that DMS's condition deteriorated rapidly thereafter;

(3) Its awareness of deterioration was further supported by its possession of a November 30, 1970 balance sheet;

(4) It had long served as DMS auditors and had been involved with DMS from its inception;

(5) DMS management relied upon Ernst & Ernst's expertise and made available all financial information requested;

(6) Ernst & Ernst personnel regularly conversed and corresponded with DMS personnel about the prospectus;

(7) Maxwell and others customarily read and commented upon the full text of all drafts of the DMS prospectus and registration statement;

(8) Ernst & Ernst reviewed copies of DMS's contracts with developers, discussed the backlog with DMS personnel, and obtained a Dun and Bradstreet report on Arbor;

(9) By December 31, 1970, only nine days after the effective date of the DMS offering, Ernst & Ernst reported that Arbor was a company without substance, organized by DMS personnel for the purpose of acting as a "developer" on DMS projects; and

(10) Ernst & Ernst participated in the due diligence examination.

 Misrepresentation in the prospectus is a manipulative and deceptive device within the meaning of the rule. *See SEC v. Wills,* 472 F.Supp. 1250 (D.D.C. 1978); *Voege v. Magnavox Co.,* 439 F.Supp. 935 (D.Del.1977) (proxy statement). An accountant may be liable for direct violation of the rule if its participation in the misrepresentation is direct and if it knows or is reckless in not knowing that the facts reported in the prospectus materially misrepresent the condition of the issuer. *Ernst & Ernst v. Hochfelder, supra; Nelson v. Serwold, supra.*

 An accountant may be liable as an aider and abettor if it knows, or is reckless in not knowing, that its client has committed a primary violation, and it substantially aids the client in the overall enterprise. *Woodward v. Metro Bank of Dallas,* 522 F.2d 84 (5th Cir. 1975); *Brennan v. Midwestern United Life Insurance Co.,* 259 F.Supp. 673 (N.D.Ind.1966).

 On this record, there appear to be material issues regarding Ernst & Ernst's knowledge of and participation in the alleged misrepresentation. It asserts that summary judgment is proper because it must succeed as a matter of law with its defense of compliance with generally accepted accounting standards. We disagree.

First, it is not clear on this record whether compliance with generally accepted accounting standards implies that Ernst & Ernst did not know of the misrepresentation and omission that occurred. Nor is it clear that the accounting standard presented supports nonaudit of the backlog.

Rather, viewing the document in the light most favorable to AF, the standard applies only to audits relating to "comfort letters" written pursuant to underwriting contracts and not to audits generally.[14]

Had Ernst & Ernst asserted by affidavit facts indicating its ignorance of the misrepresentations being made, it may have met its burden. Because it has not made clear the state of its knowledge nor the implications of compliance with generally accepted accounting standards, we believe it has not.[15]

1. *The Backlog Figures.* AF has presented evidence that Ernst & Ernst participated in the preparation of these figures. It has also presented a document showing that Ernst & Ernst was aware that Arbor was an adjunct company of DMS. Viewing Ernst & Ernst's showing most favorably to AF and taking AF's assertion as true, we conclude summary judgment relating to the backlog was improper.

2. *The Cut-Off Date.* Ernst & Ernst has presented no evidence, other than its general assertion of compliance with generally accepted accounting principles, that it was unaware that the selection of the cut-off date would show an unduly positive picture of DMS's financial situation. AF's documents suggest that Ernst & Ernst knew of DMS's deterioration in the last two months of 1970. Viewing Ernst & Ernst's showing most favorably to AF and taking AF's assertion as true, we believe that summary judgment was improper on this point also.

3. *Treatment of Developmental and Promotional Expenses.* Ernst & Ernst has supported by affidavit the assertion that treatment of this figure was dictated by the SEC. AF has offered no rebuttal evidence. Summary judgment on this point was proper.

Summary judgment was improper on AF's § 10(b) and Rule 10b–5 claim. Because common issues relate to the pendent common law fraud claim, we hold summary judgment relating to it also to be improper, and we remand it and the § 10(b) claim for the hearing of evidence.

### C. Other Matters

■ 1. *Liability Under § 15 of the 1934 Exchange Act.* AF has asserted a claim against Ernst & Ernst under § 15 of the 1934 Act (15 U.S.C. § 78o). Because this section relates to the registration and regulation of brokers, dealers or persons associated therewith, AF bases its claim on an aider and abettor or coconspirator theory of liability.

Ernst & Ernst argues that a private right of action for a primary or secondary violation of the section is not to be implied. Though some courts have implied such liability in other contexts, *see, e.g., Opper v. Hancock Securities Corp.*, 367 F.2d 157 (2d Cir. 1966), we hold as a matter of law that

---

14. Viewing it most favorably to AF, we observe that an accountant's duty to an underwriter in a "comfort letter" may be narrower than that owed to the investing public in a prospectus.

15. We have said that an accountant has no duty beyond compliance with generally accepted accounting standards to ensure his client's honesty and to enforce his client's duty with the security acts and regulations, *see SEC v. Arthur Young & Co.*, 590 F.2d 785, 788 (9th Cir. 1979). But we have noted, with reference to *United States v. Simon*, 425 F.2d 796 (2nd Cir. 1969), *cert. denied* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970), that in certain circumstances generally accepted accounting principles will not immunize an accountant if he consciously chose not to disclose a known material fact.

Generally accepted accounting principles establish guidelines relating to the process by which transactions and events of a business entity are measured, recorded, and classified in accordance with conventional format. 590 F.2d at 789 n.4.

Though there may exist differences between generally accepted accounting *principles* and *standards*, we have not decided, and we do not decide on this record, whether those differences would dictate a result different from that in *Simon* for a situation where the defendant has merely asserted in defense compliance with generally accepted accounting standards.

We assume that generally accepted accounting standards do not provide protection from liability when the accountant "fails to reveal material facts which he knows or which, but for a deliberate refusal to become informed, he should have known" should be revealed.

on this record summary judgment could properly be granted on the basis that no private right of action is to be implied under this section.[16]

██ 2. *Striking of Response to Reply Brief.* AF argues that the district court erred in striking its unscheduled responsive memoranda. Ernst & Ernst argues that the granting of its motion to strike was within the district court's discretion. We agree.

Though Fed.R.Civ.P. 56 may require a court to accept at any time affidavits that comply with the terms of the rule, acceptance or rejection of argumentative briefs, memoranda, and other supplementary material is within the sound discretion of the court. *See United States v. Johns-Manville Corp.*, 237 F.Supp. 893 (E.D.Pa.1965).

### III. *Underwriters HJ*

Regarding the HJ motion for summary judgment, we consider only HJ's limitation defenses. They were the only basis asserted for the grant of summary judgment in HJ's favor.

Hugh Johnson, Hugh Johnson & Co., and Norman Keiser were added as cross-defendants to AF's first amended cross-claim filed April 3, 1974. The second amended cross-claims was filed June 25, 1975. The extent to which claims against HJ are barred by limitations depends upon whether the second amended cross-claims relate back to the earlier cross-claims.

██ Federal Rule of Civil Procedure 15 provides that amended pleadings may relate back to earlier pleadings if certain criteria are met. The basic inquiry is whether the opposing party has been put on notice about the claim or defense raised by the amended pleading. *See* Wright & A. Miller, *Federal Practice and Procedure*, §§ 1497–98 (1973).

██ The initial cross-claims incorporated the SEC complaint. As explained *supra*, the SEC complaint described a scheme to manipulate the market in DMS stock at AF's expense. The first amended cross-claims merely added cross-defendants. The second amended cross-claims alleged for the first time the misrepresentations and omissions in the prospectus.

On this record, the district court could properly rule as a matter of law that HJ did not have notice of the new causes of action added by the second amended cross-claims sufficient for the second amended cross-claims to relate back to the earlier cross-claims.

With these data in mind, our analysis is identical to that relating to the Ernst & Ernst limitations. Claims based on §§ 11 and 12(2) of the 1933 Act are barred, as are claims based on §§ 25400–25402 of the California Corporation Code. An issue of material fact exists regarding AF's discovery of the fraud for purposes of limitations on the § 10(b) and common law fraud claims against HJ.

We hold that the summary judgment for the HJ defendant on the § 11, 12(2), and pendent Blue Sky claims was proper. Summary judgment was improper on the § 10(b) and common law fraud claims. To this extent we reverse the summary judgment for HJ and remand for the hearing of evidence.

AFFIRMED in part and REVERSED in part.

---

**16.** AF cites no cases supporting the implication of a private right of action against either direct or aider and abettor violations of § 15. We believe the terms of the section and its legislative history indicate that Congress did not intend that such liability be implied.