942 F.2d 791
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Peter GOTTLIEB, Plaintiff-Appellant,
v.
CONVERGENT TECHNOLOGIES, Defendant-Appellee.
Peter GOTTLIEB, Roberta Gottlieb, Stanley Siedman,
Plaintiffs-Appellants,
v.
CONVERGENT TECHNOLOGIES, Defendant-Appellee.
Peter GOTTLIEB, Roberta Gottlieb, Stanley Siedman,
Plaintiffs-Appellants,
and
Mark W. GAFFNEY, Appellant,
v.
CONVERGENT TECHNOLOGIES, Defendant-Appellee.
 Nos. 90-15084, 90-16576 and 90-16817.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 10, 1991.
Decided Aug. 26, 1991.
 
 Before HUG, SCHROEDER and WIGGINS, Circuit Judges.
 
 
 1
 Peter Gottlieb and a certified class of stockholders of Convergent Technologies, Inc. ("Convergent") appeals the summary judgment entered against them in this securities fraud case. They argue that they have established a genuine issue of fact that the management of Convergent deliberately inflated earnings in the second quarter of 1984 and provided misleading projections of third quarter performance in violation of the securities laws. See 15 U.S.C. § 78j(b) (§ 10(b) of the Securities and Exchange Act); 17 C.F.R. § 240.10b-5. They also argue that Convergent should not have been awarded full costs on the summary judgment motion and that appellants' attorney should not have been sanctioned under Rule 11 for his opposition to the bill of costs. The district court had jurisdiction under 15 U.S.C. § 78aa and this court has jurisdiction of the consolidated appeals under 28 U.S.C. § 1291. We affirm summary judgment, affirm in part and reverse in part the award of costs, and reverse the Rule 11 sanctions.
 
 DISCUSSION
 
 2
 A grant of summary judgment is reviewed de novo. In re Apple Computer Securities Litigation, 886 F.2d 1109, 1112 (9th Cir.1989), cert. denied, 110 S.Ct. 3229 (1990). Not all disagreements about material factual issues preclude summary judgment. Id. at 1113. The disagreements must be "genuine." That is, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Of course, the facts and all inferences must be viewed in the light most favorable to the non-moving party. Id.
 
 
 3
 To withstand a motion for summary judgment in this securities fraud case, the appellants must offer proof on which a rational jury could find that (1) fraudulent misrepresentations were made, or fraudulent business practices engaged in, (2) that were material to investors and (3) that were made with scienter. See Apple Computer, 886 F.2d at 1113.
 
 I. Second Quarter Transactions
 
 4
 The appellants allege that Convergent engaged in a comprehensive scheme to inflate second quarter earnings through a series of fraudulent business transactions. The district court found no genuine issue of fact in the allegations. We agree.
 
 
 5
 A. Declarations Supporting the Appellants--BB 54-58, RB 42-51, DCT 16-18[1]
 
 
 6
 The appellants rely heavily on the declarations of five Convergent employees to support their arguments (Carlson, Durden, Edelheit, Gervin, and Petit). Many of the evidentiary citations in their briefs, especially those supporting key allegations, are to these declarations. The district court granted the appellees' motion to strike the declarations for having no clear foundation in personal knowledge,[2] introducing hearsay, or having no demonstrated relation to the specific transactions at issue. Evidentiary rulings are reviewed for abuse of discretion. Roberts v. College of the Desert, 870 F.2d 1411, 1418 (9th Cir.1988).
 
 
 7
 From a thorough review of each declaration and the use made of each by the appellants, we find that the district court was correct, for the most part, in its assessment. The parts of the declarations that were unobjectionable did not establish a genuine issue for trial. The inferences the appellants attempted to draw from the declarations were negated by adequate explanations which the appellants did not rebut. We mention the declarations when appropriate throughout the following discussion of the transactions challenged as fraudulent by the appellants.
 
 
 8
 B. Shipments More than Two Weeks Before Requested Delivery Date--BB 21, RB 64-65, GB 19, DCT 19
 
 
 9
 The parties agree that shipments well in advance of a requested delivery date without customer approval would be a questionable business practice. The appellants allege that Convergent engaged in that questionable practice in order to inflate second quarter earnings. In support of their allegation, they offer invoices totalling $3,821,148 which show "request dates" more than two weeks after the ship date, and the declaration of Jeffrey Edelheit which states:
 
 
 10
 I was told by senior management that for the good of the company, orders had to be pulled in for two or more weeks before the dates stipulated by customers for shipment of product. In other words, if a customer did not want merchandise shipped until mid-July or later, it was shipped without the customer's agreement, in late June so that the revenue could be recorded in the second quarter of 1984.
 
 
 11
 E.R. at 3075, p 5. As the Corporate Credit and Collections Manager, Edelheit would not have responsibility for invoicing or shipping merchandise. Therefore, this statement has not been shown to be based on personal knowledge. As hearsay, the district court did not abuse its discretion in striking it.
 
 
 12
 The invoices themselves establish an inference of impropriety. However, in declarations based on personal knowledge, Convergent offered the unrebutted explanation that Convergent never shipped early without the customer's request or approval, Supp.E.R. 275:4-5 at p 7 (VP of Finance, Newman); Supp.E.R. 267:2 at p 4 (employee responsible for approving shipping and revenue recording), and that the new "request date" did not appear on the invoice in those circumstances, Supp.E.R. 270:3-4 at p 6 (general manager of accounting). The appellants offered no evidence from customers that any had received product before they desired it or were willing to receive it. No genuine issue of fact with regard to these invoices has been shown.
 
 
 13
 C. Shipments Up to Two Weeks Before Requested Delivery Date--BB 25-26, RB 64, GB 18-19, DCT 19
 
 
 14
 The appellants also argue that shipments totalling $953,035 that were made less than two weeks before the requested delivery date were improper. The appellants' accounting expert, Bernd Bildstein, states that "recognition and realization of revenue from shipments of products prior to the previously scheduled delivery date without the customer's prior approval violates GAAP [Generally Accepted Accounting Principles]...." E.R. at 3109-10, p 9. Convergent explains that it ships up to two weeks before the request date when possible so that the product will reach the customer by the request date. Supp.E.R. 263:5 at p 12 (principal accounting officer). Even if Bildstein's statement is true and Convergent's practice is improper, the practice is an ongoing and openly stated policy. As a practice that is not peculiar to the second quarter, it is not probative of a scheme to inflate second quarter earnings above what they would otherwise be.
 
 D. False Software Sales
 
 15
 The appellants argue that Convergent improperly recognized $1,340,250 in revenue for sales of software that was later returned, knowing that the customers had not ordered the software.
 
 
 16
 1. BB 22--After the second quarter, $67,500 was credited for software that Technicon claims it never ordered or received. E.R. at 860. The appellants offer no evidence that this was more than an innocent mistake.
 
 
 17
 2. BB 27-28, RB 66, GB 23-24, DCT 20--The parties dispute whether $253,000 in software sales to Gould occurred in the second or third quarter. Whichever quarter it occurred in, the appellants again offer no evidence that the sale was more than an innocent mistake.
 
 
 18
 3. BB 28-29, RB 71, GB 22-23, DCT 21--Convergent billed AT & T for $480,000 for a mix of upper and lower grade software licenses that it thought was appropriate for AT & T's purposes. AT & T paid the bill, but later opted for the lowest grade of license across the board, requiring a credit of $120,000 of the amount paid in the second quarter. Supp.E.R. 212/70. The appellants offer no evidence to rebut the conclusion of Convergent's outside auditor that the billing in the second quarter was calculated to meet deadlines under Convergent's contract with AT & T and that AT & T's later change of heart did not make the earlier revenue recognition improper. Id.
 
 
 19
 4. BB 29, RB 70, GB 25, DCT 21--The appellants suggest that $339,750 in invoices to Sigma Data, labelled "invoice only," represent improperly recognized revenue because no goods were ever shipped and the transaction was later "reversed." However, they do not rebut Convergent's evidence that "invoice only" transactions involve the sale of licenses which are intangible products that cannot be shipped. Supp.E.R. 263:4 at p 10 (Controller, Fischer). Also, Convergent testified that the transaction appeared to be reversed, but was not in reality reversed, because the debt was deducted from the price of Sigma Data stock later purchased by Convergent. Supp.E.R. 210:8-9 at p 19 (VP of Finance, Newman).
 
 
 20
 5. BB 10, RB 78 & n. 63--There is an issue of fact regarding $200,000 in software sales to Unisystems. The President of Unisystems, John Thomas, testified that on June 27, four days before the close of the second quarter, Richard Meise, Convergent's Vice President of Sales, asked Thomas to purchase $200,000 of software to help Meise meet his goal of a million dollars of software sales by the end of the quarter.[3] E.R. at 137. Thomas declined because he did not think Unisystems could use the software, but Meise persisted and told Thomas he could return it. Id. at 138. Subsequently, Thomas agreed. Meise flatly contradicts Thomas' testimony, saying that the $200,000 was for the sale of a source code to Unisystems that could only be returned in accordance with Convergent's warranty provisions, Supp.E.R. 208:8 at p 16, and that Convergent allowed the return because Unisystems said the software was incompatible with its needs, Supp.E.R. 272:4 at p 9; Supp.E.R. 258/150; Supp.E.R. 241:19-20. The district court did not discuss this dispute. Assuming Thomas' testimony is correct and the sale was improper from the beginning, the transaction inflated earnings per share by 3.8%. See Appellants' Brief Ex. A n. 4.
 
 E. False Hardware Sales--BB 22, RB 75 n. 59
 
 21
 Convergent's records of its own mistakes lists $193,000 in sales to Zygal and $150,000 in sales to Star that had not been ordered, E.R. at 919-22, and $75,639 for shipments to Burroughs of products still bearing Convergent colors and serial numbers, E.R. at 924. The appellants offer no evidence that the $418,739 in mistaken hardware sales was anything, but a mistake.
 
 
 22
 F. July Invoices Recognized in Second Quarter--BB 23-24, RB 61-63, GB 16-18, DCT 18-19
 
 
 23
 The appellants argue that $811,006 of revenue from invoices dated July 1, one day after the end of the second quarter, was improperly recognized in the second quarter. Convergent points to shipping documents bearing June dates to argue that the shipments actually were made at the end of June. See Supp.E.R. 212/73-77, 79-96; Supp.E.R. 258/153. Convergent's Manager of General Accounting testified that in the Distributed Systems Division, invoices reflect a shipping date that corresponds to the date the invoice was printed, even if that happens to be a day or two after actual shipment. Supp.E.R. 270:3 at p 5. The appellants argue that these invoices are from the Data Systems Division, not the Distributed Systems Division. Also, an employee of the shipping department stated that she was directed to "back date[ ] shipping documents so they would be dated the last day of the quarter, even though the products were actually shipped after the end of the quarter." E.R. at 3081, p 3 (Petit declaration). There is an issue of fact whether the shipment date on the invoices or the shipment date on the shipping documents reflects the true shipment date, and if shipment occurred after the second quarter, whether revenue recognition in the second quarter was proper. The revenue boosted second quarter earnings per share by 3.5%. See Appellants' Brief Ex. B.
 
 G. Understated Reserves
 
 24
 1. BB 24-25, RB (52-)57, GB 21-22, DCT 14--Convergent's outside accountants found that in a worst case scenario under disfavored accounting methods the bad debt reserves were understated $606,000 during the second quarter. Supp.E.R. 212/57:028307-08. The two other scenarios discussed by the accountants estimated an understatement of $103,000 and $129,000. The appellants seize on this to argue that Convergent executives deliberately understated the reserves by $606,000 as part of their plan to inflate earnings. However, the auditors concluded that any understatement of reserves did not have a sufficient impact on earnings to require the restatement of the second quarter financials. Id. Convergent testified that any understatement in the reserves was the result of billing or shipping errors. Supp.E.R. 212/56:28302. Given the inexact nature of estimating debt reserves, the appellants have not provided evidence that Convergent had the information in the second quarter necessary to render even a $606,000 understatement recklessly misleading.
 
 
 25
 2. BB 32, RB (52), 57-58, GB 22, DCT 14--Convergent's outside accountants found that $300,000 in additional product warranty reserves was necessary because of post-second quarter events. Supp.E.R. 268 at p 5. To rebut this evidence, appellants point out Convergent knew in the second quarter that there was a risk that rework costs on some data systems would exceed the warranty reserve. See Supp.E.R. 212/18 at 20350096 (4/24/84 executive staff meeting minutes). The appellants offer no evidence of the magnitude or nature of the risk, or the other economic factors that would have influenced the response to the risk, to show that the reasonable business decision was to increase the warranty reserves at that time. A genuine issue about the warranty reserves has not been raised.
 
 
 26
 3. BB 33 n. 22, RB 56 n. 38, DCT 15--The appellants assume from a list prepared by Convergent's Controller that $937,000 in additional inventory and administrative and manufacturing reserves taken in the fourth quarter should have been taken in the second quarter. However, nothing in the list ties the additional reserves to the second quarter and the Controller explained that events in the fourth quarter increased the reserve requirement, even if the transactions that would eventually affect the reserves occurred in prior quarters. Supp.E.R. 263:2-3 at pp 5, 6.
 
 
 27
 H. "Shipments-In-Place" to Prime--BB 26, RB 59-61, GB 20
 
 
 28
 Convergent had a contract with Prime that allowed it to transfer title to products to Prime while keeping the products on Convergent's premises for some time. Supp.E.R. 212/9:20 (Convergent's consolidated financial statements mentioning such agreements); Supp.E.R. 205:6 at p 13 (Director of Finance and Administration for the Data Systems Division). The appellants' expert, Bildstein, testified that he believed that title did not pass under the arrangement, E.R. at 3110-11, but the Commercial Code governing the parties says that "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." Cal.Commercial Code § 2401(1). The appellants have not supported their allegation that title did not pass in the second quarter, making revenue recognition of $766,800 improper.
 
 
 29
 I. Wrong Products to NCR--BB 30, RB 72-73, GB 26, DCT 20
 
 
 30
 The appellants assert that shipments of $506,600 worth of products to NCR with Convergent colors, keyboards, and serial numbers, rather than NCR colors, keyboards, and serial numbers was more than a mistake. They argue that it was part of "Meise Magic," the improper scheme to inflate second quarter sales and earnings. However, they offer no evidence to show that this was more than a mistake, such as that it was highly unusual or that significantly more "mistakes" of this kind occurred in the second quarter than in other quarters.
 
 
 31
 J. Overstated Burroughs Premium--BB 31, RB 67-70, GB 25-26, DCT 20-21
 
 
 32
 Convergent had a contract with Burroughs under which it earned a premium of differing amounts based on whether it delivered target numbers of products according to the contract. In the third quarter, Convergent was constrained to reduce the premium it had claimed as revenue in the second quarter by $488,936 because Burroughs disagreed that all the necessary shipments had been made. The appellants seize on this as evidence of improper revenue recognition. However, the Director of Burroughs Business Information and Systems Group stated that Convergent was not unreasonable in believing that it deserved the full premium, that the dispute was legitimate, and was not resolved until the third quarter. Supp.E.R. 207 at p 9. The appellants offer no evidence, but their own allegation that Convergent was unreasonable.
 
 
 33
 K. Shipment of Defective Products--BB 31-32, RB 73-74, GB 26, DCT 21
 
 
 34
 The appellants allege that Convergent deliberately shipped defective products to ADP, Alanthus, and CPT in order to recognize $915,000 in revenue in the second quarter. They thoroughly describe the problems Convergent's customers were having with certain products, Supp.E.R. 191, Appendix A, and provide the generalized testimony of a Convergent quality engineer that unqualified people inspected products, that improper and incomplete tests were performed, and that a substantial quantity of poor quality products were shipped, E.R. at 3072-73 (Durden declaration). The appellees offered testimony that the extent of the problems was not known until after customers began using the products and that Convergent responded to the complaints by fixing and replacing products. Supp.E.R. 205:6-7 at p 14 (Director of Finance and Admin. of Data Systems Division); Supp.E.R. 261:2-3 at pp 4-8 (Manufacturing Manager for Data Systems Division).
 
 
 35
 The appellants offer no proof that because some of Convergent's products did not meet Convergent's own performance projections, the products were too defective to market. They also offer no proof that the numbers of complaining customers and performance problems were unusual for the second quarter or unusual for a computer manufacturer generally.
 
 
 36
 L. Shipment Against Cancelled Order--BB 32 n. 21, RB 67 n. 53, DCT 20
 
 
 37
 November 30, 1984 internal notes at Convergent indicate that $700,000 worth of products were returned from Burroughs because they were shipped against a cancelled order. The appellants allege that the shipment occurred in the second quarter. They offer no proof for their allegation.
 
 M. Duplicate Billings and Shipments--BB 23
 
 38
 The appellants offer no proof that $147,695 in duplicate shipments and $101,073 in duplicate billings was anything, but a legitimate mistake to be expected in the ordinary course of business.
 
 N. Summary
 
 39
 If the appellants have established a genuine issue of fact regarding the propriety of transactions that have a material effect on second quarter earnings, summary judgment should be reversed. The appellants raised a genuine issue regarding only two of the transactions. One was the sale of software to Unisystems for $200,000 in the last few days of the second quarter. See supra, section D5. The other was $811,005 of revenue recognized in the second quarter from the sale of products that may have been shipped on July 1, one day after the close of the second quarter. See supra, section F. Assuming that both of these transactions were improper and part of a scheme to inflate second quarter earnings, they inflated earnings per share by 7.3%. That is, minus the transactions, earnings per share would have been reported at 10cents per share rather than 11cents per share. The difference is not significant enough to provide circumstantial evidence of an intent to fraudulently inflate earnings.
 
 
 40
 If we also assume that all of the shipping and billing mistakes in the second quarter that were pointed out by the appellants were actually deliberate attempts to inflate earnings, see supra, sections D1-2, E, I, L, and M, the effect of the mistakes inflated earnings per share by 10.7%. Combined with the Unisoft and alleged July transactions, earnings per share would have been inflated from 9cents per share to 11cents per share. That difference is likewise not strong enough circumstantial evidence of fraud, absent more direct evidence of scienter, to create a genuine issue for trial.
 
 
 41
 We affirm the district court's grant of summary judgment against appellants with respect to securities fraud in the second quarter.
 
 II. Third Quarter Press Releases
 
 42
 Appellants argue that Convergent's press releases in the third quarter regarding management's expectations for third quarter earnings were fraudulent and misleading. Statements of expectation are actionable under § 10(b) of the Securities Act if (1) the material statement is not genuinely believed by the one making it, (2) there is no reasonable basis for the expectation, or (3) the speaker is aware of undisclosed facts that tend to seriously undermine the statement's accuracy. Apple Computer, 886 F.2d at 1113. It should not be forgotten that statements of expectation are not statements of fact. They are not fraudulent simply because they are not fulfilled. However, if a speaker is reckless[4] with regard to the adverse undisclosed information, the scienter element necessary for 10(b) liability is met. Nelson v. Serwold, 576 F.2d 1332, 1337 (9th Cir.), cert. denied, 439 U.S. 970 (1978).
 
 A. The September 18, 19 Press Releases
 
 43
 The September releases reported that Convergent had decided to wait to issue its planned debenture offering until third quarter results were disclosed, but that it anticipated no change in its profit expectations, which were in line with those of securities analysts ranging from fifteen to twenty cents per share. As it turned out, Convergent made a profit of only seven cents per share in the third quarter. Appellants list several facts which they allege were known or should have been known at the time of the September releases which make the releases fraudulent.
 
 
 44
 Appellants allege that Convergent failed to disclose the real reason the debenture offering was postponed: because the president of the company, Mr. Michels, refused to "guarantee" a profit or give strong assurances of a profit, for the underwriters before the quarter results were in. They allege that Michels' hesitancy in negotiations with the underwriters is evidence that he did not believe the positive earnings forecast published in the September releases. This allegation lacks merit. The September 18 release stated that the debenture offering was postponed to await third quarter results. The appellants have no evidence that Michels' hesitancy to give strong assurances to the underwriters meant that he did not believe his company's internal profit forecasts. In fact, one of the underwriters testified that at the same time that Michels refused to guarantee a profit, he also told the underwriters that he did expect the company's objectives to be met. E.R. at 2976-77. Michels testified in his declaration that he believed the forecasts would be met and was surprised by the actual results. Supp.E.R. 203:14 at p 32. Other high-ranking executives testified similarly. Supp.E.R. 206:9-10 at p 19 (Wegbreit, Chief Operating Officer); Supp.E.R. 205:13 at p 28 (Willits, Vice President of Finance).
 
 
 45
 Appellants argue, in the alternative, that facts existed at the time of the statements that seriously undermined the statements' accuracy and show that they had no reasonable basis. They argue that Convergent knew or should have known that it had insufficient orders to meet its projections. However, appellants present no evidence that Convergent had insufficient orders. They point out that as much as one-half of the shortfall in the third quarter, according to Convergent's calculations after-the-fact, may be attributed to "insufficient demand" or "lack of orders." E.R. 1340-42. However, Convergent gives several unrebutted explanations for why their projections were reasonable, although part of the shortfall did ultimately result from insufficient orders. First, several Convergent executives stated in their affidavits that Convergent routinely sought and received orders late in the quarter.[5] Supp.E.R. 203:4-5 at p 10; Supp.E.R. 206:5-6 at p 10; Supp.E.R. 201:8-9 at pp 20-21. Second, customers unexpectedly ordered more of the basic, less profitable NGEN modules than the complex, more profitable NGEN modules. Supp.E.R. 203:17-18 at p 39; Supp.E.R. 10 at p 21. Third, Burroughs, a major customer, completely cancelled $700,000 worth of orders for complex NGEN modules in the last few days of September. Contrary to appellants' assertions, Burroughs testified in an affidavit that although Convergent knew that Burroughs intended to begin manufacturing some of the products it usually purchased from Convergent, Burroughs did not tell Convergent that that would occur as early as the third quarter, or that Burroughs would be replacing Convergent's high profit, not low profit, modules with its own. Supp.E.R. 207:7 at pp 12-14. Finally, notes from a meeting of high-ranking executives on September 21, three days after the September press releases, says that there are "enough orders to cover forecasts." E.R. at 1989. Appellants offer nothing, but their assertions that Convergent somehow should have foreseen the orders shortfall. Assertions cannot create a genuine factual issue.
 
 
 46
 Finally, appellants argue that the great disparity between earnings and projections in July and August alone eviscerated the optimistic September releases of any reasonable basis. They point out that minus Workslate losses, losses in the first two months of each of the first and second quarters were only 3cents per share, whereas losses in July and August totalled 9cents per share. Also, earnings per share for the same period in the first and second quarters were 4cents below projections, but earnings per share for July and August were 15cents below projections. This disparity is indeed troubling and suggests a presumption that something was wrong with the third quarter projections. To boost such a presumption into a genuine issue of fact, however, the appellants would need to provide evidence from Convergent's business records that showed with particularity how the projections were faulty, such as which assumptions made in the calculations were unreasonable. Then they would need to provide evidence that the unreasonable assumptions were so unreasoanble that Convergent's management was reckless to rely on them.
 
 
 47
 The appellants have not provided the evidence necessary to create a genuine issue of fact regarding the September press releases. We affirm summary judgment with regard to them.
 
 B. The October 4 Press Release
 
 48
 The October 4 press release revealed that, based on preliminary indications,[6] revenues for the third quarter would be "substantially higher than those for the second quarter," but that earnings from continuing operations would be "approximately the same" as in the second quarter (11cents per share). During the October 3 meeting in which management decided on the language for the release, management had only a revenue "flash" report to work with from which to estimate the third quarter earnings per share. Supp.E.R. 203:14-15 at p 33; 205:13-14 at p 29; Supp.E.R. 212/44.
 
 
 49
 The appellants argue that the October 4 press release was misleading and without a reasonable basis. The appellants' evidence for their allegation is the deposition testimony of the Director of Investment Relations, Mr. Dunmire,[7] and some preliminary figures for earnings per share that were several cents lower than the 11cents implied in the release.[8]
 
 
 50
 Dunmire testified that during the October 3 meeting, Mr. Willits, the Vice President of Finance at the time, expected that the company would earn "somewhere around" 8cents per share. E.R. at 3204. Willits denies the statement. Supp.E.R. 205:17 at p 35. Assuming that Willits made the statement during the meeting, Dunmire also testified that he and the others present eventually concluded that 11cents per share was the best view of the earnings the company may have made in the third quarter, E.R. at 3203-04, and was not misleading. Supp.E.R. 249/150:288. The estimation had a basis in the estimation of the profit margin on the unsold goods, which was converted to earnings per share (7cents) and subtracted from the last earnings per share forecast of 19cents to get 12cents.[9] Supp.E.R. 205:14-15 at p 31; see also Supp.E.R. 212/108:181-82, 185-87 (Michel's deposition).
 
 
 51
 The preliminary earnings per share figures computed by the company on the same day as the press release estimated an earnings per share figure of 7cents. E.R. at 565. The appellants argue that this is also evidence that the release was misleading. However, the appellants do not rebut the appellees' explanations that management knew this figure was incorrect because the preliminary worksheet contained overstated bonuses and sales commissions (based on outdated sales forecasts) and did not reflect the forthcoming audit or accounting adjustments. Supp.E.R. 201:13-14 at p 30; 205:16 at pp 33-34. Also, because revenue was up 25% from the second quarter, management believed that third quarter earnings had to be at least as high as in the second quarter, Supp.E.R. 203:16 at p 36; 205:14-15 at p 31; 208:10 at p 21, an apparently reasonable assumption that proved incorrect.
 
 
 52
 The appellants also highlight Dunmire's testimony that Michels told him that he had promised Mr. Towbin, an outside director and holder of a substantial number of shares in Convergent, that "he would put out a positive press release to stop the decline in stock." E.R. at 3206, 3248. The appellants argue that this is evidence that the October 4 release was in reckless disregard of the truth. Without more evidence to rebut that already discussed, we disagree. The evidence already discussed shows that preliminary indications that earnings per share would be approximately the same in the third quarter as in the second were reasonable. See Apple Computer, 886 F.2d at 1117 (unrebutted explanations can defeat inferences of bad faith).
 
 
 53
 We affirm summary judgment against the appellants for each of the third quarter press releases.
 
 III. Award of Appellees' Costs
 
 54
 The district court accepted some of the appellants' objections to the appellees' bill of costs and rejected others, but ultimately granted the appellees' request in full because plaintiffs "failed to meet their burden of establishing with particularity" which costs should be disallowed. E.R. at 18. An award of costs will be disturbed only for abuse of discretion. Alflex Corp. v. Underwriters Laboratories, Inc., 914 F.2d 175, 176 (9th Cir.1990), petition for cert. filed, (March 20, 1991) (No. 90-1782). A district court necessarily abuses its discretion if its ruling is based on erroneous legal conclusions or clearly erroneous assessments of the evidence. Cooter & Gell v. Hartmarx Corp., 110 S.Ct. 2447, 2461 (1990).
 
 
 55
 We affirm the district court's reasoning and award of costs with the following exceptions: The $180.00 and $11,092.24 allowed for microfilming documents duplicates the hard copy costs of the same documents also taxed to the appellants. Under the district court's own principles, these costs should have been disallowed.
 
 
 56
 Although we affirm the remaining costs, we note our disagreement with one of the district court's principles. The district court stated that a party cannot recover costs for copying documents produced to other parties. The court reasoned that such costs were not for documents "necessarily obtained" by the party producing the documents, as 28 U.S.C. § 1920(4) requires, because the documents were already within the producing party's possession. This construction of § 1920(4) appears novel and unduly narrow. See Illinois v. Sangamo Constr. Co., 657 F.2d 855, 867 (7th Cir.1981) (costs for "discovery documents tendered to defendants" allowed to plaintiffs under § 1920(4)); E.E.O.C. v. Sears, Roebuck and Co., 111 F.R.D. 385, 393 (N.D.Ill.1986) (same); Fressell v. AT & T Technologies, Inc., 103 F.R.D. 111, 115 (N.D.Ga.1984) (same); cf. 6 Moore's Fed. Practice at p 54.77 (2d ed. 1991) (no suggestion that costs for discovery produced to opposing party not allowed by "necessarily obtained" language). However, because the district court did not follow its own principle and disallow the specified costs, we affirm the result.
 
 
 57
 Finally, we agree with the appellants and the district court that costs for depositions and documents sent to the appellees at appellants' expense should not be allowed. Nevertheless, the district court's rejection of appellants' assertion that certain documents were sent at their expense is not an abuse of discretion because the appellants offered no proof for their assertions.
 
 
 58
 The bulk of the district court's cost award ($49,439.16) is affirmed. The award of microfilm costs ($180.00 and $11,092.24) is reversed.
 
 IV. Rule 11 Sanctions
 
 59
 The district court sanctioned the attorney, Mark Gaffney, who signed the declaration in support of the appellants' objections to the bill of costs. In support of the sanctions, the court discussed two cases it believed had been misrepresented in the objections and noted generally "plaintiffs' counsel [sic] overall conduct of this litigation mentioned previously." E.R. at 20.
 
 
 60
 A general reference to "overall conduct" cannot support sanctions under Rule 11. Rule 11 provides for sanctions only for the signing of specific pleadings or papers that contain legal or factual arguments which are frivolous, or which were prepared for an improper purpose. Other conduct, however dilatory, must be sanctioned under another statute or rule, or not at all. Cunningham v. County of Los Angeles, 879 F.2d 481, 490 (9th Cir.1988), cert. denied, 110 S.Ct. 757 (1990); see also In re Yagman, 796 F.2d 1165, 1187-88, amended by, 803 F.2d 1085 (9th Cir.1986).
 
 
 61
 The two cases cited by Gaffney were not misrepresented, as the district court concluded. The district court stated that, contrary to Gaffney's argument, Morrison v. Alleluia Cushion Co., 73 F.R.D. 70 (N.D.Miss.1976) does not stand for the proposition that "[a] defendant cannot recover costs of the defendant's own deposition." However, Morrison clearly disallows costs for the deposition of a witness because that witness "occupied the position of an active party in the litigation representing defendant's interest throughout trial." Id. at 72. It is fair to conclude that Morrison supports the proposition that costs for depositions of witnesses who support the defense, which would include the defendants themselves, are not allowed. It is not clear whether any local rules supported the holding in Morrison. The proposition apparently has no support in the Local Rules applicable to this case,[10] but the district court did not list that as the reason for imposing sanctions.
 
 
 62
 The district court also said that, contrary to Gaffney's argument, Viacao Aerea Sao Paulo v. International Lease Finance Corp., 119 F.R.D. 435 (C.D.Cal.1988) does not stand for the proposition that "costs of deposition transcripts for depositions taken by plaintiffs" are not allowed. The district court recognized that Viacao does disallow costs "attributed to copying of depositions taken by plaintiff," id. at 439 (emphasis added), but pointed out that the principle does not extend to originals, as the court believed the appellants contended. However, the appellants also recognize that the principle does not extend to originals. Nevertheless, they argue that Gaffney's use of Viacao was correct because the "overwhelming custom among lawyers" in federal practice is that the party taking the deposition pays for the original. Caldwell v. Wheeler, 89 F.R.D. 145, 147 (D.Utah 1981); 8 Wright & Miller, Federal Practice and Procedure, § 2117 at 431 (1978). All other copies acquired from that party or from the court reporter directly are, therefore, "copies." Taking that assumption into account, it is safe to say that Viacao stands for the proposition that costs of transcripts for depositions taken by plaintiffs are not allowed to the defendants because the plaintiffs will almost always have borne the original transcription cost as a matter of course. Therefore, any transcript provided to the defendant is a cost prohibited by Viacao as a cost "attributed to the copying of depositions taken by plaintiff." Viacao, 119 F.R.D. at 439 (emphasis added). The district court may disagree with this holding in Viacao, but the court cannot maintain that it is not, at least arguably, the holding.
 
 
 63
 Because the cases cited by appellants in their opposition to the bill of costs arguably do stand for the propositions asserted by the appellants, we hold that the district court abused its discretion in imposing Rule 11 sanctions against Gaffney.[11]
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 BB = Blue Brief (Appellants), RB = Red Brief (Appellees), GB = Grey Brief (Reply), DCT--District Court's Opinion. If a citation to one of these sources is not given in the heading, the topic was not discussed in that source
 
 
 [2]
 Affidavits in support of summary judgment motions must be based on personal knowledge. Information and belief are not sufficient. Fed.R.Civ.P. 56(e); Taylor v. List, 880 F.2d 1040, 1045 n. 3 (9th Cir.1989)
 
 
 [3]
 The appellants make much of the fact that Meise was praised by Convergent for enabling Convergent to meet its sales projections with "Meise Magic," and that Meise was offered a $100,000 bonus to "incentivize [him] to create additional profit to ensure the company meets its after-tax goal of 8 cents per share." E.R. at 679. However, the appellants offer no evidence, except perhaps the Unisystems transaction, that Meise did anything outside the bounds of accepted sales tactics to earn the affectionate label "Meise Magic," or that the $100,000 bonus was unusual under the circumstances. See Supp.E.R. 208:7-8 at p 15 (Meise declaration)
 
 
 [4]
 Reckless conduct means highly unreasonable conduct or an extreme departure from the standards of ordinary care such that "the danger of misleading buyers [is] actually known or so obvious that any reasonable man would be legally bound as knowing." Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569-70 (9th Cir.1990), cert. denied, 111 S.Ct. 1621 (1991)
 
 
 [5]
 Appellants attempt to rebut this with Convergent's prospectus, which says that customers give order forecasts in their contracts. E.R. at 238. However, the prospectus also states that customers have some leeway in meeting these forecasts, both in numbers and in kind of products. As seen infra, Convergent says that much of the third quarter shortfall resulted from orders of basic, low profit computer systems rather than the complex, high profit systems they anticipated sending the same customers. Nowhere is it suggested that choices such as these were foretold in the contracts with these customers
 
 
 [6]
 Final financial figures would not be available until late October. Supp.E.R. 203:14-15 at p 33; 205:13-14 at p 29
 
 
 [7]
 Dunmire quit his job at Convergent in November 1984 because he felt that he was not being given the information necessary to do his job. E.R. at 3237-42. However, that deposition testimony cited by the appellants does not support their contention that Dunmire quit because he believed the appellees "defrauded investors through the third quarter press releases." Reply Brief at 41 n. 37. Dunmire was concerned about inconsistencies between what he was told and what he saw in a prospectus regarding fourth quarter and beyond. He did say, "I was certainly concerned about the third quarter, and whether we would meet--what we had publicly said that we would ..." E.R. at 3239, but he did not say in the deposition excerpts provided by appellants, that he believed that appellees had defrauded investors
 
 
 [8]
 The decision to issue the release was made the evening of October 3 and the preliminary figures were dated October 4, suggesting that management may not have seen the figures until after the release was issued on October 4. During the October 3 evening discussion, management had only a revenue "flash" report from which they calculated their own estimate of earnings per share
 
 
 [9]
 Although he did not believe the press release was misleading, Dunmire testified that he believed the 12cents per share figure pressed by Michels during the October 3 meeting was "pulled out of the air" and not worthy of much weight. E.R. at 3245
 
 
 [10]
 Appendix A to the Local Rules for the Northern District of California states, in relevant part:
 The cost of an original and one copy of any deposition ... for any purpose in connection with the case is allowable.
 
 
 [11]
 There is also a concern that Gaffney did not receive adequate notice and an opportunity to be heard before Rule 11 sanctions were imposed, as this court requires. Tom Growney Equip., Inc. v. Shelley Irrigation Dev., Inc., 834 F.2d 833, 836 (9th Cir.1987) (due process requires notice and an opportunity to be heard before Rule 11 sanctions can be imposed). In the hearing on the motion to retax costs, the district court did say, "[I]f I read this case again and believe that it does go beyond reasonable advocacy and is really misinterpreting cases seriously, then I am going to impose sanctions." Aug. 7, 1990 Hearing Transcript at 26. However, Gaffney was not present at the hearing and the only case mentioned by name as possibly being misrepresented was Morrison. Nothing else was said until the court actually imposed sanctions in its September order denying the motion to retax costs. By then it was too late for Gaffney to respond